**Norwick ADAMS, III, a/k/a Wick Adams, Appellant,**

v.

**H & H MEAT PRODUCTS, INC., Appellee.**

No. 13–97–924–CV.

Court of Appeals of Texas, Corpus Christi.

March 1, 2001.

Ricardo A. Garcia, Lisa D. Powell, Gary L. Gurwitz, Atlas & Hall, L.L.P., McAllen, Attorneys for Appellant.

Hector Uribe, Brownsville, Derly J. Uribe, Edmundo O. Ramirez, Ellis, Koeneke & Ramirez, McAllen, Attorneys for Appellee.

Before Justices, DORSEY, HINOJOSA, and RODRIGUEZ.

## OPINION

HINOJOSA, Justice.

Appellant, Norwick Adams, III, a/k/a Wick Adams ("Adams"), appeals from the trial court's judgment rendered in favor of appellee, H & H Meat Products, Inc. ("H & H"). By seven issues, Adams contends: (1) the trial court erred by rendering judgment against him for (a) contract of sale or sworn account, (b) breach of contract of guarantee, and (c) promissory estoppel, fraud, and quantum meruit; (2) the trial court erred by awarding H & H damages, prejudgment interest, and attorney's fees; and (3) the trial court erred by not making findings of fact and conclusions of law. We affirm.

### A. BACKGROUND

Adams is employed by and is the director general and a minority shareholder of Desarrollos W. De Alimentos Del Norte S.A. de C.V. ("Whataburger Mexico"). Desarrollos holds the Whataburger franchise for Monterrey and Guadalajara. H & H is a company that sells meat products to Whataburger franchises in the United States. Sometime in 1991 or 1992, Liborio Hinojosa ("Hinojosa"), the president and CEO of H & H, met with Adams to set up a procedure so that meat products could be sent to Mexico for Whataburger Mexico.

Adams or an associate ordered meat products from H & H by fax or telephone. Adams instructed H & H to ship the ordered meat products to S.R. Forwarding, a forwarding agent in Laredo, Texas. Adams also instructed H & H to invoice the meat products in the name of Proveedora de Alimentos Contratados, S.A. de C.V. ("PAC") because PAC had a permit to import meat products into Mexico, and Adams did not. PAC would then sell the meat to Whataburger Mexico.

The case stems from three unpaid shipments of meat that were delivered by H & H to S.R. Forwarding pursuant to Adams' instructions. The dates of these shipments are August 3, 1994 (in the amount of $7,172.70), August 8, 1994 (in the amount of $6,614.93), and August 16, 1994 (in the amount of $2,232.00). All three shipments were delivered to Whataburger Mexico.

When H & H asked PAC why the three shipments had not been paid, PAC said it had not paid H & H because Adams had not paid PAC. H & H then sought payment directly from Adams because Adams had told H & H that he would be personally responsible for meat purchased by Whataburger Mexico. Adams refused to pay the balance owed to H & H.[1]

H & H sued Adams on a sworn account and for breach of contract or promissory estoppel, common law fraud, and quantum meruit. After a bench trial, the court found in favor of H & H and rendered judgment against Adams for $12,945.80, prejudgment interest at the rate of twelve percent per annum ($3,495.42), attorneys' fees in the amount of $11,000.00, and post-

---

1. Sometime before or about the time this suit was filed, PAC went out of business.

judgment interest at the rate of twelve percent per annum.

## B. FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ In his seventh issue, Adams contends the trial court erred by failing to make findings of fact and conclusions of law. The trial court signed the judgment on October 3, 1997. Adams timely requested findings of fact and conclusions of law on October 17, 1997, and filed a timely notice of past-due findings on November 12, 1997. *See* TEX.R.CIV.P. 296, 297. The trial court did not file the requested findings of fact and conclusions of law.

Rules 296 and 297 impose a mandatory duty on the trial court to file findings of fact and conclusions of law within thirty days of the date of judgment at the request of either party. *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989). The trial court erred by failing to make appropriate findings of fact and conclusions of law.

We ordered the present appeal abated and directed the trial judge to make findings of fact and conclusions of law and to send them to this Court. The trial court has done so. Accordingly, Adams' seventh issue is now moot.

## C. H & H'S MOTION TO DISMISS FOR WANT OF JURISDICTION

On February 17, 1998, H & H filed a motion to dismiss this appeal for want of jurisdiction because Adams did not perfect his appeal within thirty days from the date the judgment was signed. *See* TEX. R.APP.P. 26.1. The judgment was signed on October 3, 1997, and Adams filed his notice of appeal on December 10, 1997.

H & H contends that Adams did not timely file proper requests for findings of fact and conclusions of law which would have extended the time to file a notice of appeal to ninety days from the date the judgment was signed. *See* TEX.R.APP.P. 26.1(a)(4). After reviewing the record, we find that Adams timely filed a request for findings of fact and conclusions of law, thus extending the time for filing his notice of appeal. We deny H & H's motion to dismiss this appeal for want of jurisdiction.

## D. STANDARD OF REVIEW

■ Findings of fact in a case tried to the court have the same force and dignity as a jury's verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Simmons v. Compania Financiera Libano, S.A.*, 830 S.W.2d 789, 791 (Tex. App.—Houston [1st Dist.] 1992, writ denied). We review the court's findings of fact by the same standards used to review the sufficiency of the evidence to support a jury's findings. *Winters v. Arm Refining Co., Inc.*, 830 S.W.2d 737, 739 (Tex.App.— Corpus Christi 1992, writ denied). The judgment of the trial court will not be set aside if there is any evidence of a probative nature to support it, and this Court may not substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. *Ray v. Farmers' State Bank of Hart*, 576 S.W.2d 607 (Tex.1979); *Humphrey v. Camelot Retirement Comm.*, 893 S.W.2d 55, 58 (Tex.App.—Corpus Christi 1994, no writ). However, while the factual findings of the trial court in the instant case are binding upon this Court, its conclusions of law are not likewise binding, and this Court is free to make its own legal conclusions. *Muller v. Nelson Sherrod & Carter*, 563 S.W.2d 697, 701 (Tex. Civ.App.—Fort Worth 1978, no writ). Conclusions of law are reviewed *de novo* as a question of law and will be upheld if the judgment can be sustained on any legal theory supported by the evidence. *Circle C Child Dev. Ctr., Inc. v. Travis Cent.*

*Appraisal Dist.,* 981 S.W.2d 483, 485 (Tex. App.—Austin 1998, no pet.). A trial court's conclusions of law may not be challenged for factual sufficiency. *Id.* Conclusions of law will not be reversed unless they are erroneous as a matter of law. *Stable Energy, L.P. v. Newberry,* 999 S.W.2d 538, 547 (Tex.App.—Austin 1999, pet. denied); *Hofland v. Fireman's Fund Ins. Co.,* 907 S.W.2d 597, 599 (Tex.App.—Corpus Christi 1995, no writ). Incorrect conclusions of law do not require reversal if the controlling findings of fact support a correct legal theory. *Stable Energy,* 999 S.W.2d at 547.

▮▮ Texas law requires that an effort be made to reconcile conflicts in findings of fact. *First Fin. Dev. Corp. v. Hughston,* 797 S.W.2d 286, 294 (Tex.App.—Corpus Christi 1990, writ denied). This same rule has been applied to conflicts between findings of fact and conclusions of law. *Hartford Ins. Co. v. Jiminez,* 814 S.W.2d 551 (Tex.App.—Houston [1st Dist.] 1991, no writ). This same reasoning should be applied in reconciling conclusions of law and the judgment when two possible interpretations exist, the interpretation should be chosen that will harmonize the judgment with the findings of fact and conclusions of law upon which it is based. *Grossnickle v. Grossnickle,* 935 S.W.2d 830, 841 (Tex. App.—Texarkana 1996, writ denied).

▮ When we review a "no evidence" or legal sufficiency of the evidence issue, we must consider all of the record evidence in a light most favorable to the party in whose favor the verdict has been rendered, and indulge in that party's favor every reasonable inference deducible from the evidence. *Formosa Plastics v. Presidio Eng'r,* 960 S.W.2d 41, 48 (Tex.1998). When both legal and factual sufficiency issues are raised, we must first review the legal sufficiency to determine if there is any evidence of probative value to support

the judge's findings. *See Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex. 1981). The findings of fact must be upheld if there is more than a scintilla of evidence in support thereof. *Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979). There is more than a scintilla when the evidence creates more than a mere surmise or suspicion of its existence. *See Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983).

▮ If the findings are supported by legally sufficient evidence, we must then review the factual sufficiency of the evidence. When we review an "insufficient evidence" or factual sufficiency of the evidence issue, we consider, weigh and examine all of the evidence which supports or undermines the finding. *Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). Because the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony, we may not substitute our judgment for that of the fact finder's conclusions. *Id.* at 634; *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951). Where there is conflicting evidence, the trial court's determination on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 512 (1947).

### E. Breach of Contract

▮ In his second issue, Adams contends a judgment based on breach of contract is not proper against him individually. Adams asserts there is no evidence, or insufficient evidence, to support a finding that Adams personally guaranteed payment.

▇▇▇▇ In its pleadings, H & H contended Adams breached a sales contract for the sale of meat products. When parties enter into a contract for the sale of goods, chapter 2 of the Texas Business and Commerce Code controls the conduct of the parties. A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognize the existence of such a contract. TEX.BUS. & COM. CODE ANN. § 2.204(a) (Vernon 1994). The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages to the plaintiff resulting from that breach. *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex.App.—El Paso 1998, pet. denied); *Wright v. Christian & Smith*, 950 S.W.2d 411, 412 (Tex.App.—Houston [1st Dist.] 1997, no pet.); *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex.App.—El Paso 1993, no writ). The requisites for a valid contract are: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). The determination of whether there was a meeting of the minds of the parties is based on the objective standard of what the parties actually said and did, rather than on their subjective state of mind. *Id.*

In the instant case, the evidence shows that sometime in 1991 or 1992, Adams met with H & H, specifically Hinojosa, to set up a procedure to send meat products to Adams in Mexico because Adams was going to operate a Whataburger franchise in Mexico. Adams specifically wanted meat from H & H because:

> they were at the time already producing a large quantity for Whataburger Incorporated under the specifications as dictated by Whataburger Incorporated, and, of course, their geographical location. And I think also as a lack of alternatives in the country at the time.

The method by which H & H would sell and deliver meat to Adams was as follows:

(1) Adams or an associate would call or fax the meat order to H & H with time and date delivery specifications;

(2) H & H would fill the order and ship it to S.R. Forwarding, invoiced to PAC. The invoice, indicating amount shipped and price, was faxed to Whataburger Mexico, S.R. Forwarding, and PAC.; and

(3) PAC, a transportation company with an import permit, would then deliver the meat to Whataburger Mexico.

Adams ordered specific meat from H & H and directed the means of delivery, he cannot now claim that he is not the responsible party. Adams testified, "the only way that we could have it distributed in the same trucks and store to store was for PAC to purchase the meat and warehouse it for use because they maintain an inventory of several different products-many different products for us for resale." Adams directed H & H to bill the meat products to PAC because PAC, not Adams, had the required permits from the Mexican government to allow the shipments.[2]

---

2. Liborio Hinojosa testified:

The reason that it has to be billed to PAC is that when you import product into Mexico you have to have a permit, and the permit that is given to the person or a company when we prepare meat for export, we have to do three things, one is the invoice has to be in the name of the permit, and then all the federal documents, which is two of them have to be in the name of the permit.

Hinojosa testified Adams specifically told him that "he would be responsible to pay [H & H] for all the purchases that [Whataburger Mexico] [made]," and that Adams had said he "personally will guarantee the purchases." Hinojosa interpreted this to mean that Adams "would be responsible to see that [H & H] got paid for [its] meat," and that Adams' representation was not in a corporate capacity.

Rey De la Rosa ("De la Rosa"), production manager for H & H, testified (1) there was a business relationship between H & H and Adams, (2) when PAC was late on payments, H & H would call Adams and inform him that the meat would not be delivered, Adams would say "Don't worry about it, Rey. I'll be responsible for paying for that meat. Ship the meat, please. We need the meat."; and (3) the orders came from Adams, not PAC.

Adams testified that he forwarded the orders to H & H, as well as PAC, "for the purpose of ensuring the logistics of this—this operation because the logistics were very—a big concern of ours given the fragility of the product and the time frame of trying to get it across the border." He further testified that when PAC was late paying H & H, De la Rosa would call him, and he would tell De la Rosa "that [he] would handle it and talk—get to talk to PAC, and we would try—tell PAC that we would not pay those monies to PAC until PAC brought H & H current." Adams further stated that when PAC was dissolved and they discovered that H & H had not been paid, "if we had been notified in a timely manner, we would certainly have gladly diverted these funds to H & H since PAC no longer existed."

Even though Adams used PAC as an intermediary for delivery, the meat prod-

And since Adams did not have the permit, we had to bill the person that had the

ucts were bought by Adams by fax or telephone call. While it is true that: (1) H & H did not have anything in writing from Adams personally guaranteeing any debt, (2) Adams was not billed for the meat, and (3) H & H was paid by PAC, we cannot say that a contract did not exist between Adams and H & H. When Adams placed his order with H & H, there was a sale of meat products. When questioned about negotiating prices of meat with H & H, Adams testified:

H & H's Counsel: So you don't deny that you did talk about prices with H & H?

Adams: As it pertains to the mix of the patty, yes.

H & H's Counsel: And who—if there was a new price who had to agree to that?

Adams: Well, we had to either buy it or not buy it, I guess.

H & H's Counsel: What about on H & H's part, if there was-I mean, if there was some type of change [in price], you would have to deal with H & H and not PAC?

Adams: Well, H & H posted a price, I guess, weekly or biweekly and to all of their customers.

H & H's Counsel: Did you ever agree to a new price?

Adams: I guess we must have. In the course of doing business, there were fluctuations, so if it went up or down we would have to agree.

H & H's Counsel: But it wasn't PAC, correct?

Adams: PAC is part of it, of the equation, yes.

permit.

According to Hinojosa and De la Rosa, Adams said he would be responsible for paying H & H for the meat. H & H established that the meat they provided Adams was valuable to him. The testimony of all parties established that the meat was needed by Adams for the Whataburger Mexico franchises. The testimony of Hinojosa and De La Rosa established that Adams repeatedly informed them to ship the meat because "he needed the meat."

Hinojosa and De La Rosa informed Adams that they had not been paid for the shipments and that H & H expected to be paid. They testified that Adams told them "I'll take care of it," and "I'll be responsible for paying the meat," at which point Hinojosa would override H & H's normal policy of not shipping when there were late payments and shipped orders because Adams "needed it and we would get paid later." Adams testified that he told H & H that he would pressure PAC to pay, "or at some point we would be happy to pay— if [PAC] didn't pay them, the company would be happy to pay H & H because it would be cheaper." From these communications, Adams knew that H & H expected to be paid, and H & H provided the court with three invoices for the shipments in question that have yet to be paid.

The evidence shows that: (1) Adams and H & H contracted for the sale of meat products, (2) Adams promised to pay H & H for the meat, (3) H & H delivered the meat, (4) Adams did not pay for the meat, and (5) H & H presented invoices that have not been paid. We hold the evidence is legally and factually sufficient to support the trial court's finding that Adams personally guaranteed payment and that Adams breached the contract between himself and H & H.

### F. Sworn Account

■ In his first issue, Adams contends that H & H cannot recover on a sworn account because there is no evidence, or insufficient evidence, to support the trial court's finding that there was a sale and delivery of goods to Adams personally. The essential elements to prove a sworn account are: (1) that there was a sale and delivery of merchandise or performance of services; (2) that the amount of the account is just, that is, that the prices were charged in accordance with an agreement or were customary and reasonable prices; and (3) that the amount is unpaid. *Worley v. Butler*, 809 S.W.2d 242, 245 (Tex.App.—Corpus Christi 1990, no writ).

■ Adams complains only that there is no evidence, or insufficient evidence, to prove the first element, a sale and delivery of merchandise between himself and H & H. Adams contends that in order to prove a sworn account, H & H must show a sale of goods to him, individually. Adams argues that: (1) the account was in the name of PAC, (2) the meat was for Whataburger Mexico, and (3) he was acting on behalf of Whataburger Mexico.

■ A "sale" consists in the passing of title from the seller to the buyer for a price. Tex.Bus. & Com.Code Ann. § 2.106 (Vernon 1994). "A delivery by direction of the buyer to a third person as intermediary to ship the goods is a good delivery to the buyer." *Walker–Smith Co. v. Jackson*, 123 S.W.2d 993, 996 (Tex.Civ.App.—Amarillo 1938, writ dism'd jm't cor.). "Buyer" means a person who buys or contracts to buy goods. Tex.Bus. & Com.Code Ann. § 2.103(a)(1) (Vernon Supp.2001). "Seller" means a person who sell or contracts to sell goods. Tex.Bus. & Com.Code Ann. § 2.103(a)(4) (Vernon Supp.2001).

The record shows that Adams, not PAC, ordered the meat from H & H. H & H shipped the meat to Adams via PAC, as instructed by Adams because PAC had the

necessary permits to ship into Mexico. Adams received the meat from PAC. When PAC was late in paying H & H for shipments, Adams told H & H:

> Don't worry about it, Rey. I'll be responsible for paying for that meat. Ship the meat, please. We need the meat.

Although H & H delivered the meat to PAC to help Adams avoid the permit obstacle, PAC was simply the intermediary; Adams was the buyer.

We hold the evidence is legally and factually sufficient to support the trial court's finding that there was a sale and delivery of goods to Adams personally. We further hold the evidence is legally and factually sufficient to establish a sworn account against Adams.

### G. Statute of Frauds

#### 1. *Contract for Sale of Goods Over $500*

■ In his first issue, Adams also asserts that recovery by H & H is barred by the statute of frauds. Specifically, Adams contends that a contract for the sale of goods for more than $500 must be in writing, and the transactions at issue, although more than $500, were not in writing.

Section 2.201(a) of the Texas Business and Commerce Code provides:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

* * * * *

(c) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable

* * * * *

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2.606).

Tex.Bus. & Com.Code Ann. § 2.201 (Vernon 1994). Section 2.606 defines acceptance of goods as:

(a) Acceptance of goods occurs when the buyer

(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(b) Acceptance of a part of any commercial unit is acceptance of that entire unit.

Tex.Bus. & Com.Code Ann. § 2.606 (Vernon 1994). Section 2.602 provides:

(a) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless

the buyer seasonably notifies the seller.

TEX.BUS. & COM.CODE ANN. § 2.602 (Vernon 1994).

▇▇▇ Comment 2 to section 2.201 states: "Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists." TEX.BUS. & COM. CODE ANN. § 2.201 cmt. 2 (Vernon 1994). Adams recognizes the exception to the statute of frauds of goods that have been received and accepted, but asserts that the exception does not apply because the meat was delivered to S.R. Forwarding, PAC's forwarding agent, not to Adams or Whataburger Mexico. As we stated above, PAC was simply a carrier for Adams, the ultimate buyer. Adams used PAC to transport the meat products because he did not have the necessary permits to transport meat into Mexico. While H & H actually delivered the meat to PAC, it was delivered for the benefit of Adams, the buyer. Adams received the meat products and accepted them.

▇▇▇ Whether the circumstances of a particular case fall within an exception to the statute of frauds is generally a question of fact. *Adams v. Petrade Int'l, Inc.* 754 S.W.2d 696, 705 (Tex.App.—Houston [1st Dist.] 1988, writ denied) (citing *Vehle v. Brenner,* 590 S.W.2d 147, 152 (Tex.Civ. App.—San Antonio 1979, no writ)). If a party claims that an exception to the statute of frauds exists, he must secure a finding to that effect. *Barbouti v. Munden,* 866 S.W.2d 288, 295 (Tex.App.— Houston [14th Dist.] 1993), *overruled on other grounds by Formosa Plastics v. Presidio Eng'r,* 960 S.W.2d 41, 47 (Tex.1998); *W.H. McCrory & Co. v. Contractors Equip. & Supply Co.,* 691 S.W.2d 717, 720– 21 (Tex.App.—Austin 1985, writ ref'd n.r.e.); *see also Wise v. Anderson,* 163 Tex. 608, 359 S.W.2d 876, 881 (1962) (party

seeking to toll statute of limitations must obtain such finding).

The trial court's findings of fact establish:

22. On or about August 3, 1994, Adams, or someone associated with Adams, ordered meat products from H & H by telephone in the amount of seven thousand one hundred and seventy-two dollars and seventy cents ($7,172.70).

\* \* \* \* \*

24. The meat products ordered on or about August 3, 1994, were delivered to S.R. Forwarding pursuant to Adams' instruction and the custom of doing business between H & H and Adams.

25. The bill of lading reflects that these goods were received.

26. On or about August 8, 1994, Adams or someone associated with Adams, ordered meat products from H & H by telephone in the amount of six thousand six hundred and fourteen dollars and ninety-three cents ($6,614.93).

\* \* \* \* \*

28. The meat products ordered on or about August 8, 1994, were delivered to S.R. Forwarding pursuant to Adams' instruction and the custom of doing business between H & H and Adams.

29. The bill of lading reflects that these goods were received.

30. On or about August 16, 1994, Adams of someone associated with Adams, ordered meat products by telephone in the amount of two thousand two hundred and thirty-two dollars ($2,232.00).

\* \* \* \* \*

32. The meat products ordered on or about August 16, 1994, were delivered to S.R. Forwarding pursuant to Adam's instruction and the custom of doing business between H & H and Adams.

33. The bill of lading reflects that these goods were received.

34. The meat products were delivered by H & H to S.R. Forwarding, at the instruction of Adams.

Based on the trial court's findings and PAC's role as a carrier for Adams, the buyer, we hold the contract between Adams and H & H is an exception to the statute of frauds.

### 2. *Personal Guarantee*

■ In his second issue, Adams also contends that the statute of frauds bars any alleged personal guarantee made by him on behalf of Whataburger Mexico. Hinojosa testified that Adams stated he would personally guarantee payment for the meat purchases. The parties agree that there is no guarantee in writing. Adams asserts that the alleged guarantee is barred by the statute of frauds under Texas Business and Commerce Code section 26.01. Section 26.01 provides:

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to:

\* \* \* \* \*

(2) a promise by one person to answer for the debt, default, or miscarriage of another person;

TEX.BUS. & COM.CODE ANN. § 26.01 (Vernon 1987).

■ The statute of frauds is an affirmative defense that must be affirmatively pleaded or it is waived. *See* TEX. R.CIV.P. 94; *Praeger v. Wilson,* 721 S.W.2d 597, 602 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). In his answer, Adams pleaded a statute of frauds defense only to H & H's claim that Adams had breached a contract for sale of goods under section 2.201 of the Texas Business and Commerce Code. Adams did not plead an affirmative defense under section 26.01. Because Adams failed to plead this defense, we hold it is waived.[3]

---

**3.** Assuming, *arguendo,* that Adams did not waive his statute of frauds contention on the alleged guarantee, there is an exception to section 26.01(a) where a promisor accepts primary responsibility for the debt of another, and his "leading object" or "main purpose" is to serve some interest of his own, his oral promise does not come within the statute of frauds and is enforceable. *Haas Drilling Co. v. First Nat'l Bank in Dallas,* 456 S.W.2d 886, 891 (Tex.1970); *Smith, Seckman, Reid, Inc. v. Metro Nat'l Corp.,* 836 S.W.2d 817, 820–21 (Tex.App.—Houston [1st Dist.] 1992, no writ).

There are three tests to determine if a promise is enforceable, notwithstanding the statute of frauds:

1. Did the promisor intend to become primarily liable for the debt, in effect making it his original obligation, rather than to merely become a surety for the original obligor?
2. Was there consideration for the promise?
3. Was receipt of the consideration the promisor's main purpose or leading object in making the promise, i.e., was the consideration given for the promise primarily for the promisor's own use and benefit.

*Haas Drilling Co.,* 456 S.W.2d at 890; *Smith, Seckman, Reid, Inc.,* 836 S.W.2d at 821.

We overrule Adams' first and second issues.

## H. PROMISSORY ESTOPPEL

In his third issue, Adams contends the trial court erred in rendering judgment against him for promissory estoppel. Specifically, Adams asserts that H & H tried to use promissory estoppel to "avoid their failure to obtain a contract in writing."

Although promissory estoppel is normally a defensive theory, it is an available cause of action to a promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise. *David McDavid Nissan, Inc. v. Subaru of Am., Inc.*, 10 S.W.3d 56, 73 (Tex.App.—Dallas 1999, pet. granted) (citing *Wheeler v. White*, 398 S.W.2d 93, 96–97 (Tex.1965); *Henderson v. Texas Commerce Bank–Midland, N.A.*, 837 S.W.2d 778, 781–82 (Tex.App.—El Paso 1992, writ denied)). However, in its pleadings, H & H pleaded promissory estoppel as an alternative to its cause of action for breach of contract to guarantee payment. Because we have held the evidence is legally and factually sufficient to support the trial court's finding that Adams personally guaranteed payment and that Adams breached the contract between himself and H & H, it is unnecessary to address Adams' third issue. *See* TEX.R.APP.P. 47.1.

## I. FRAUD

In his fourth issue, Adams contends there is no evidence, or insufficient evidence, to support the trial court's finding that he intended to defraud H & H.

In the instant case, Adams (1) directed H & H regarding the specific meat to be shipped; (2) told Hinojosa that he would be responsible for paying for the meat; and (3) had H & H deliver the meat to PAC because he did not have the necessary permits to transport the meat into Mexico. The consideration for Adams' promise to pay was the meat itself.

To prove fraud, H & H had to show that: (1) Adams made a material misrepresentation; (2) which was false; (3) when Adams made the representation he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) Adams made it with the intention that it should be acted upon by H & H; (5) H & H acted in reliance upon it; and (6) H & H thereby suffered injury. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998). Because the representation in this case involves a promise to do an act in the future, H & H also had to prove that, at the time Adams made the promise, he had no intention of performing the act. *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex.1992); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 433 (Tex.1986); *Stanfield v. O'Boyle*, 462 S.W.2d 270, 272 (Tex.1971).

Because Adams challenges the sufficiency of the evidence, we must review the evidence adduced at trial to determine whether evidence exists which would support the trial court's finding that the elements of fraud were met. We find the following in the record:

(1) Adams made a material representation to H & H that he would be responsible for paying for the meat products. At trial, H & H presented the testimony of Hinojosa and De la Rosa which established that Adams would take care of the payments H & H had not received from PAC for the meat delivered to PAC for Adams.

Receipt of the meat was Adams' main purpose in making the promise to pay because, in his own words, "we need the meat." Adams needed to insure that Whataburger Mexico had the meat because it was an "integral part" of the business. Therefore, Adams' promise is enforceable, notwithstanding the statute of frauds.

(2) Adams' representation was false because there are three invoices that have not been paid and are the subject of this suit.

(3) Adams recklessly represented to H & H that he would be responsible for paying for the meat because he was extremely concerned about not having the meat necessary for the Whataburger Mexico operation. Adams told De la Rosa, "Don't worry about it, Rey. I'll be responsible for paying for that meat. Ship the meat, please. We need the meat." Adams needed the meat and falsely represented to H & H that he would personally insure payment.

(4) Adams told Hinojosa and De la Rosa on the telephone that he would be responsible for paying for the shipments and not to hold back shipments for failure to pay, because he needed the meat. Adams' testimony reiterates "the logistics were very—a big concern of ours given the fragility of the product and the time frame of trying to get it across the border." This is evidence Adams made the statement in order to get H & H to send him more meat.

(5) H & H overrode its normal policy of not shipping until past-due bills were paid.

(6) By overriding its policy, H & H suffered because it was not paid for the last three shipments.

■ Denying that a promise has been made is a factor in showing no intent to perform when the promise was made. *Spoljaric,* 708 S.W.2d at 435. While a factor, a party's denial that he made a promise is not sufficient by itself to establish that the party did not intend to perform the promise when it was made. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992).

Adams testified, "I'm not involved in every day-to-day decision nor do I see everything, and so I can't be held personally liable for all these issues." When asked his understanding of the business relationship with H & H, Adams stated:

> Well, that they would ship and sell their meat to PAC. And we, or my stores would then order products from PAC. . . . And so they would systematically order with PAC, and in some cases then we would project our meat usage for the next week or two, whatever the shelf life was, and that's when Richard Maddox would get involved. And on occasion, a couple of occasions as indicated here, I would get involved to ensure that the—that PAC would have an adequate supply in a logistical sort of way.

When asked who ultimately paid for the meat purchases, Adams stated, "I assume since we never paid H & H direct that these were paid for by PAC." We hold the evidence is legally and factually sufficient to support the trial court's finding that Adams intended to defraud H & H. We overrule Adams' fourth issue.

## J. QUANTUM MERUIT

In his fifth issue, Adams contends the trial court erred by rendering judgment against him for quantum meruit.

■ The doctrine of quantum meruit is based on the principle that a party deserves to be paid for the services or materials he furnishes. Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received. *Heldenfels Bros., Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 41 (Tex.1992); *Salazar v. Coastal Corp.,* 928 S.W.2d 162, 169 (Tex.App.—Houston [14th Dist.] 1996, no pet.). A person should be compensated for his efforts when an express contract does not provide recovery for the reasonable value of the

services rendered and accepted. *Black Lake Pipe Line Co. v. Union Const. Co., Inc.,* 538 S.W.2d 80 (Tex.1976); *Wood v. Texas Farmers Ins. Co.,* 593 S.W.2d 777, 781 (Tex.Civ.App.—Corpus Christi 1979, no writ). Because we have held the evidence is legally and factually sufficient to support the trial court's finding that Adams personally guaranteed payment and that Adams breached the contract between himself and H & H, it is unnecessary to address Adams' fifth issue. *See* Tex.R.App.P. 47.1.

### K. Damages, Attorneys' Fees, and Interest

In his sixth issue, Adams complains the trial court erred in finding damages and awarding H & H prejudgment interest and attorneys' fees. The trial court rendered judgment against Adams for $12,945.80, prejudgment interest at the rate of twelve percent per annum ($3,495.42), attorneys' fees in the amount of $11,000.00, and post-judgment interest at the rate of twelve percent per annum.

#### 1. *Damages*

Adams contends that since H & H cannot recover on a breach of contract claim, and H & H "wholly failed to provide evidence of tort damages sustainable under theories of fraud or promissory estoppel," the trial court erred in awarding damages. We disagree.

■■■■ We have held that the evidence in this case is legally and factually sufficient to support the trial court's finding that Adams personally guaranteed payment and that Adams breached the contract between himself and H & H. In order to recover compensatory damages, the plaintiff must establish that he suffered some pecuniary loss as a result of the breach of the contract. *Stewart v. Basey,* 150 Tex. 666, 245 S.W.2d 484, 486 (1952); *Prudential Sec.,* 973 S.W.2d at 397; *Braselton–Watson Builders, Inc. v. Burgess,* 567 S.W.2d 24, 28 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). The evidence must show that the damages are the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 687 (Tex.1981); *Prudential Sec.,* 973 S.W.2d at 397; *Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147, 156 (Tex.App.—Houston [1st Dist.] 1991, writ denied). The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery. *Prudential Sec.,* 973 S.W.2d at 397; *Nelson Cash Register, Inc. v. Data Terminal Sys., Inc.,* 671 S.W.2d 594, 600 (Tex. App.—San Antonio 1984, no writ).

■■■■ The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991). By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. *Id.; see Stewart,* 245 S.W.2d at 486 (measure of damages for breach of contract is just compensation for damages actually sustained by plaintiff as a result of defendant's default).

H & H introduced into evidence the three invoices that had not been paid. These invoices were for the meat delivered to PAC for Adams. These invoices represent the loss sustained by H & H when Adams breached the contract. We hold the trial court did not err by finding that H & H had sustained damages in the amount of $12,945.80.[4]

---

**4.** This amount represents the three invoice amounts ($7,172.70, $6,614.93, and $2,232.00) less adjustments for all lawful payments, credits, and offsets.

### 2. *Attorneys' Fees*

■ Adams contends an award of attorneys' fees cannot be sustained because "H & H's breach of contract claim cannot be sustained." We have held the evidence is legally and factually sufficient to support H & H's claims of breach of contract and sworn account. *See* Tex.Civ. Prac. & Rem.Code Ann. § 38.001(7), (8) (Vernon 1997). Attorney's fees may also be recovered upon a finding of fraud arising out of a breach of contractual relations. *Gill Sav. Ass'n,* 797 S.W.2d at 31. Accordingly, we hold the trial court did not err in awarding H & H attorneys' fees in the amount of $11,000.00.

### 3. *Interest*

■ Adams contends that in accordance with Texas Finance Code section 302.002, contract interest, absent agreement, is six percent. *See* Act of June 19, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex.Gen.Laws 3422 (amended 1999) (current version at Tex.Fin.Code Ann. § 302.002 (Vernon Supp.2001)). This is true. However, the invoices for the meat products, the subject of this suit, state:

> On the last Saturday of every month, invoices which are 15 days or older are considered past due and will be assessed a late charge at the periodic rate of 1% per month, which is an annual percentage rate of 12%. Buyer agrees to pay attorney's fees and costs if legal proceedings are instituted to effect collection. All payments are due and payable in Mercedes, Hidalgo County, Texas.

Thus, Adams and H & H agreed to prejudgment interest at the rate of twelve percent per annum.

■ Damages awarded for breach of contract bear prejudgment interest. "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., f/k/a Armada Supply Inc.,* 962 S.W.2d 507, 528 (Tex.1998). In *Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480, 485 (Tex.1978), the supreme court recognized two separate bases for the award of prejudgment interest: (1) an enabling statute; and (2) general principles of equity. Statutory prejudgment interest applies only to judgments in wrongful death, personal injury, property damage, and condemnation cases. Tex. Fin.Code Ann. §§ 304.102, 304.201 (Vernon Supp.2001); *Kenneco,* 962 S.W.2d at 530. Here, H & H is entitled to recover on its breach of contract claim. Therefore, any award of prejudgment interest is governed by the common law. *Kenneco,* 962 S.W.2d at 530. Plaintiffs have been permitted to recover prejudgment interest on both liquidated and unliquidated claims in contract disputes. *See Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enters.,* 625 S.W.2d 295 (Tex.1981) (the rate for prejudgment interest is the interest rate set by the contract); *Miner–Dederick Constr. Corp. v. Mid–County Rental Serv., Inc.,* 603 S.W.2d 193, 200 (Tex.1980). The invoices in this case clearly set forth the interest to be paid by Adams if payment was past due. We hold the trial court did not err in awarding H & H prejudgment interest at the rate of twelve percent per annum.

■ A judgment for money damages for breach of contract also bears interest from the date of the judgment until it is paid. *See* Act of June 19, 1997, 75th Leg., R.S., ch. 1008, § 1, 1997 Tex.Gen.Laws 3434 (amended 1999) (current version at Tex.Fin.Code Ann. § 304.001 (Vernon Supp.2001)). The statute on postjudgment interest in effect at the time this judgment was signed provided:

A judgment of a court of this state on a contract that provides for a specific interest rate earns interest at a rate equal to the lesser of:

(1) the rate specified in the contract, which may be a variable rate; or

(2) 18 percent a year.

Act of June 19, 1997, 75th Leg., R.S., ch. 1008, 1997 Tex.Gen.Laws 3434–35 (amended 1999) (current version at TEX.FIN.CODE ANN. § 304.002 (Vernon Supp.2001)).

■ As we stated previously, the invoices provided that interest would accrue at the rate of twelve percent per annum. We hold the trial court did not err in awarding H & H postjudgment interest at the rate of twelve percent per annum. We overrule Adams' sixth issue.

The judgment of the trial court is affirmed.