# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 3, 2004

## STATE OF TENNESSEE v. CORNELL MARLEY HYDER

**Appeal from the Criminal Court for Trousdale County**
**No. 01-83 ABCD     J. O. Bond, Judge**

---

**No. M2003-00833-CCA-R3-CD - Filed June 3, 2004**

---

The appellant, Cornell Marley Hyder, also known as Cornbread, was convicted by a jury of one count of rape of a child, one count of rape, one count of aggravated sexual battery, and one count of sexual battery, for which he received an effective seventeen-year sentence. In this direct appeal, the appellant presents the following issues for review: (1) whether the trial court erred in refusing to allow testimony pursuant to Tennessee Rule of Evidence 412; (2) whether the trial court erred in denying the motion to suppress; (3) whether the trial court erred in denying the motion for directed verdict; (4) whether the trial court erred in failing to charge the jury on election of offenses; (5) whether the evidence established the venue of the offense on the charge of rape; and (6) whether the evidence was sufficient to support the verdict. We affirm the convictions and sentences, but remand for correction of the judgment forms.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed, Case Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

B. F. "Jack" Lowery and G. Jeff Cherry, Lebanon, Tennessee, for the appellant, Cornell Marley Hyder.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The appellant and his wife, Crystal Hyder, lived in a double-wide trailer near the river in Hartsville, Tennessee, which is located in Trousdale County. A garage type outbuilding was located close to the home where the appellant stored his jet ski and four-wheeler and kept his welding equipment. The appellant and his wife are both truck drivers, spending four to six days a week on the road. During the summer of 2001, Mrs. Hyder's daughter, Pam, and her five children lived with the appellant and his wife. Also living in the trailer were the appellant's son Billy as well as several other relatives and their children. As many as seventeen people were living in the trailer at one time.

At some point during the summer, the appellant and his wife became upset about the budding relationship between Pam and Billy. They both felt that the relationship was wrong because Pam and Billy were step-brother and sister and this situation led to several heated discussions. As a result of these discussions, Pam, her five children and Billy moved to a motel in Lebanon.

That summer, A.N.,[1] Pam's thirteen year old daughter, became concerned about C.N., her ten year old sister, because she always had money and was complaining "about her butt hurt or something." In addition, C.N. was always "gone with Grandpa" when they were staying at the trailer. When A.N. asked C.N. whether their grandfather was "trying to make her do things," she denied it. Once they were staying at the hotel, however, C.N. admitted to her sister that she was being sexually abused by the appellant. C.N. said that she did not tell anyone because the appellant said that he would kill her if she did. They told their mother about the abuse and the following day they went to the sheriff's office where both C.N. and A.N. gave statements about being sexually abused by the appellant.

C.N. was often in the appellant's garage, helping him while he repaired cars. She would hand him the tools he needed or clean up things by sweeping the floor while he worked. One time, C.N. was sitting on the appellant's lap when he unzipped his pants and forced her to "rub" his "wee wee" until he ejaculated. C.N. asked the appellant what the "white stuff" was and he told her that it was the "stuff that makes women pregnant." Each time that the appellant forced C.N. to have sex with him, he gave her money, usually a dollar.

Another time, in the garage, C.N. complained to the appellant that her hands were tired from rubbing his penis, so the appellant explained to her how to perform fellatio. The appellant ejaculated in C.N.'s mouth, so she washed it out with the appellant's Coca-Cola.

---

[1] It is the policy of this Court not to identify minor children involved in sexual abuse cases by name.

-2-

Yet another time, when C.N. was driving a four-wheeler down to the river, the appellant pulled down his pants and started rubbing his penis against her "bottom." She tried to free herself, but the appellant "had his hand on both sides" of the four-wheeler.

A.N. was also abused by the appellant. On one occasion, her grandmother asked her to go to the garage to get some cokes. While in the garage, the appellant asked A.N. if she could "give him head" and she refused. The appellant persisted by telling her that he had let her "get away with things." He then grabbed A.N. by the arm and twisted it, forcing her to perform fellatio. A.N. performed fellatio for about five minutes and the appellant told her that it "felt good." A.N. "quit" and ran away before the appellant "finished" and the appellant got mad.

On another occasion, A.N. said that as her mother and grandmother were leaving the house to go to the store, the appellant approached her while she was in bed and rubbed up against her saying, "come on give me head." A.N. screamed for one of her younger sisters, but the appellant placed a pillow on her head. The appellant "took off" when her mother and grandmother returned in the car, but before he ran away, the appellant touched A.N. "under and down" her shirt and on her cheek.

The final instance of abuse of A.N. took place on the boat in the river "a couple of weeks" before the girls told their mother of the abuse. The appellant left some of the children on the river bank while she and the appellant went to put the boat in the water. The appellant offered her marijuana, and A.N. took a "couple of puffs." At that point, the appellant claimed that A.N. "owed him" because he allowed her to go on the boat. He grabbed her by the hair and put his penis in her mouth. When A.N. "didn't finish," the appellant "went off the side of the boat and he jacked off the rest of the way." After that, the appellant picked up the other children and took them fishing.

When confronted with the allegations made by C.N. and A.N., the appellant initially denied the abuse. On September 11, 2001, the appellant voluntarily went to the police station and gave a statement to the authorities in which he denied the abuse. He was interviewed that day by Waylon Cothron, Chief Deputy Sheriff of Trousdale County and Detective David Wynette. Detective Wynette also took the statements of C.N. and A.N. several days prior to September 11. The appellant's initial statement claimed that

> [a]bout March 2001, Charles William Hyder, my son, his girlfriend, Pamela . . . and her 5 children  . . . all moved in with me and my wife at our home.
>
> In August Pamela and Charles moved out with the children. A week later school started. We talked Pamela into letting 3 stay with us. A.N., C.N., and . . . [another child] came to stay. My wife and I drive an over the road truck. We are gone 4-6 days at a time. When we were gone the girls stayed with son Barry and his wife Elizabeth at our house. There have been times I have been alone with the girls.

I have never made sexual remarks in their presence. I have never made any sexual contact with any of the girls. I have never seen them with their clothes off. I don't believe they have seen me with my clothes off, unless they came into the bedroom and I wasn't aware of it.

Several weeks later, on September 25, 2001, Michael Smith, a Special Agent Criminal Investigator with the Tennessee Bureau of Investigation, interviewed the appellant at city hall. The appellant came to meet Agent Smith voluntarily and, at the time of the interview, the appellant was not under arrest and free to leave at any time. However, Agent Smith read the appellant his Miranda rights and had him sign a written waiver of those rights prior to the interview. After being interviewed for some time, the appellant gave a verbal statement which was later reduced to writing. The second statement reads:

Around July, middle of July, first time me and . . . C.N. was [sic] in my garage . . .C.N. came over and set [sic] in my lap and was rubbing on me. I got a hard dick. I got it (my dick) out and she starting playing with it and jacking it off. Before I got off I walk [sic] off to the other room in garage and finish it. Then we went up to the house.

Then three or four weeks later I gave her a dollar to play with my dick. She [C.N.] said for two dollars she would put [it] in her mouth. So I give [sic] her two dollars. She got my dick out and started playing with it then put it (my dick) in her mouth and went up and down a few times. Then she quit. I then walk [sic] off and finished it.

Then another couple weeks later we was [sic] at my garage . . . C.N. came over and started [to] get my dick out. . . . C.N. started playing with my dick and then started [to] suck on it a little. When I got ready to get off I push . . . C.N. off and walk off and started cumming. . . . C.N. came over and seen [sic] me get off. . . . C.N. ask [sic] me what was the white stuff. I told . . . C.N. that what makes baby.

Around three months ago . . . A.N. was laying on the bed in my living room. Me and . . . A.N. got to wrestling on the bed and my dick got hard. Then . . . [another child] came out of another room and I walk [sic] away.

Around the last part of last month before the school dance on Friday in the afternoon I bought . . . A.N. a pack of cigarettes. She said if I buy the cigarettes she suck my dick. Then me and . . . A.N. went out on my boat on the river. We went to pick up . . . [another child and C.N.] but me and . . . A.N. stop before we pick [sic] them up. . . . A.N. smoke [sic] her dope in a pipe. We got on my couch on my pontoon boat. I ask her if she was ready to pay up. She said yes. I took my dick out. . . . A.N. went [sic] to playing with my dick and sucking it. This last for maybe two or three minute. . . . A.N. just sat up and quit. I put my dick up. We went on down the river and went fishing.

The appellant was indicted by the Trousdale County Grand Jury on September 26, 2001, on charges of rape of a child, rape, aggravated sexual battery, and sexual battery. Count One, rape of a child and Count Three, aggravated sexual battery, pertained to situations involving C.N. Count Two, rape, and Count Four, sexual battery, pertained to situations involving A.N.

At trial, the appellant testified that he was always surrounded by relatives and children and that he never took his boat out on the river with just one child. He claimed that he always left his garage doors open when he was at home and that his neighbor who lives across the road often came into the garage to talk and help him work. The appellant denied that he ever touched C.N. or gave her money for sexual favors. He claimed that he gave C.N. money for doing work in his garage because she had a habit of stealing from people. He thought that rewarding her with money in exchange for work would teach her a valuable lesson. He also denied ever being alone on the boat with A.N. The appellant claimed that he only gave the second statement in which he confessed to the crimes because Agent Smith told him if he confessed to some of the sexual abuse he would "get off with probation and therapy" rather than going to jail for forty years with no parole.

Mrs. Hyder also testified at trial. She believed that her husband was innocent and she had no concerns about the appellant being around her grandchildren. In fact, she stated that C.N. and A.N. never complained about the appellant or showed any fear of him.

At the conclusion of the trial, the jury found the appellant guilty on all charges. After a sentencing hearing, the trial court ordered the appellant to serve an effective seventeen-year sentence.[2] In this direct appeal, the following issues are presented for our review: (1) whether the trial court erred in refusing to allow testimony pursuant to Tennessee Rule of Evidence 412; (2) whether the trial court erred in denying the motion to suppress; (3) whether the trial court erred in denying the motion for directed verdict or motion for judgment of acquittal; (4) whether the trial court erred in failing to charge the jury on election of offenses; (5) whether the evidence established the venue of the offense on the count of rape; and (6) whether the evidence was sufficient to support the verdict.

Tennessee Rule of Evidence 412

The appellant asserts that he was denied his right to a fair trial because the trial court erred by limiting the cross-examination of the victim regarding specific instances of her prior sexual conduct under Tennessee Rule of Evidence 412. He argues that the victim's sexual experiences from persons other than the appellant included an incident wherein her Aunt caught her "giving head" to her boyfriend. Thus, he contends, it was imperative that he be permitted to show that the victim's

_____

[2]The judgment sheets do not accurately reflect the manner of service of the sentence. The transcript controls when the record shows a conflict between the judgment form and the transcript. See, e.g., State v. Moore, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991). At the sentencing hearing, the trial court ordered the appellant to serve concurrent sentences of fifteen years for rape of a child, ten years for aggravated sexual battery, and ten years for rape. In addition, the trial court ordered the appellant to serve a two-year sentence for sexual battery consecutive to the fifteen year sentence for a total effective sentence of seventeen years.

"knowledge of sexual matters" was obtained from persons other than the accused. See Tenn. R. Evid. 412(c)(4)(ii). Specifically, he claims that evidence of A.N.'s "sexual relations with persons other than the defendant would clearly have been admissible [under Tennessee Rule of Evidence 412] to prove knowledge of sexual matters and call her credibility into question." The State counters that as a result of the jury-out hearing held on the matter, the appellant was permitted to establish that A.N. had a "moderately sophisticated sexual vocabulary." As a result, the State argues that the trial court gave the appellant "sufficient leeway to explain . . . A.N.'s knowledge of sexual matters consistent with Rule 412(c)(4)(ii)."

At the outset, we note that Tennessee Rule of Evidence 412 provides in pertinent part:

(c) Specific instances of conduct. Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
(1) Required by the Tennessee or United States Constitution, or
(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
(3) If the sexual behavior was with the accused, on the issue of consent, or
(4) If the sexual behavior was with persons other than the accused,
(i) to rebut or explain scientific or medical evidence, or
(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
(iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c). In addition, Tennessee Rule of Evidence 412 also states:

[i]f the court determines that the evidence which the accused seeks to offer satisfies subdivisions (b) or (c) and that the probative value of the evidence outweighs its unfair prejudice to the victim, the evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined.

Tenn. R. Evid. 412(d)(4).

As recognized by Rule 412(c)(1), there are instances where otherwise inadmissible evidence must be admitted in order to protect the constitutional rights of the accused. See Chambers v. Mississippi, 410 U.S. 284, 295-96 (1973); State v. Brown, 29 S.W.3d 427, 436 (Tenn. 2000). Our state supreme court has stated:

[t]he facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence

is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

Brown, 29 S.W.3d at 433-34 (citing Chambers, 410 U.S. at 298-301). This court must consider and balance the principles of relevance and hearsay under the Tennessee Rules of Evidence with the rights of the accused to confront and cross-examine witnesses and to call witnesses in his defense when determining whether the evidence is admissible.

We again observe that the appellant's stated purpose for seeking to introduce the contested additional information was "to prove or explain knowledge of sexual matters." See Tenn. R. Evid. 412(c)(4)(ii). According to the Advisory Committee Comments, this provision

. . . will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity. To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties.

In the case herein, the proof that the appellant sought to introduce involved an incident in which A.N. had allegedly been caught by her aunt "giving head" to a boy during the summer of 2000.

In handling this matter, we note initially that the appellant followed the proper procedure under Rule 412 concerning notice of his intent to offer proof of A.N.'s sexual behavior in order to show prior knowledge of sexual matters. During A.N.'s testimony, a jury-out hearing was held in which the appellant's counsel sought to explore where A.N. acquired her extensive sexual vocabulary. Trial counsel sought to "ask the witness regarding those matters" in front of the jury to show that she did not receive her knowledge of sexual matters from the appellant. The trial court allowed trial counsel to ask questions during the jury-out hearing regarding A.N.'s sexual knowledge "for the record just for the record to show what you would find." Trial counsel proceeded to question A.N. about a specific instance in which her Aunt allegedly caught her "giving head." A.N. testified that she did not know "giving head" constituted "oral sex." She claimed that she learned the terms "giving head" and "jacking off," "from everybody that talks like that." The trial court ruled that A.N. could testify to "her knowledge without going into specific acts." The trial court opined that , "the only thing [that is material] is whether she had knowledge."

When the jury returned, the trial court allowed trial counsel to ask A.N. where she learned the terminology "giving head." A.N. responded that she "heard it from everybody talking about it, how fun it was and everything else." She also testified that she understood that "giving head" referred to "oral sex."

We observe that "[t]rial judges are empowered with great discretion regarding the trial process, including the scope of cross-examination," and that such "discretion will not be disturbed unless an abuse" thereof is found. State v. Williams, 929 S.W.2d 385, 389 (Tenn. Crim. App.1996). We further note that the Advisory Commission Comments to Rule 412 explain that this rule was designed to "strike a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." These dual sets of interests are vitally important and are to be carefully weighed by the trial court in making these decisions. After reviewing the record provided, we find that the trial judge in the instant case took great care to protect the concerns of both the appellant and the victim through the allowed inquiry. See State v. Steven Otis Nicely, No. 03C01-9805-CR-00174, 1999 WL 826029, at *6-*7 (Tenn. Crim. App. at Knoxville, Oct. 18, 1999).

Though the appellant avers that the trial court too severely restricted his right to confront his accuser, we determine that the jurors were adequately informed as to a separate basis for A.N.'s knowledge of sexual matters without permitting inquiry into extraneous details to further embarrass the victim. Further, while A.N. was not permitted to testify that she gained such knowledge through her own sexual experiences, trial counsel was able to prove that A.N. had knowledge of sexual matters prior to her abuse that she did not glean from the appellant, the very goal of Rule 412. This issue is without merit.

## Motion to Suppress

Next, the appellant argues that the trial court erred in denying the motion to suppress his statement. Specifically, he claims that the trial court improperly led defense counsel to believe that the appellant "bore the burden of proof" on the motion, that he was prejudiced when the State was allowed to establish that he failed a polygraph examination, and that the trial court improperly commented that law enforcement officers can "trick" interviewees. The State avers that the trial court credited the officer's testimony and the record does not preponderate against the trial court's denial of the motion to suppress.

Initially, we note that although the motion to suppress was filed prior to trial, there was no separate suppression hearing prior to trial. Rather, a jury-out hearing was held on the motion to suppress. During the jury-out hearing, the testimony of Agent Smith, Detective Wynette, and the appellant was introduced. The testimony of Agent Smith directly contradicted that of the appellant. The appellant repeatedly insisted that Agent Smith and Detective Wynette guaranteed that he would not be sentenced to a term of incarceration if he confessed to the crimes. In stark contrast, the officers testified that they merely encouraged the appellant to confess by holding out the possibility that he could get counseling for pedophilia.

The testimony elicited from Agent Smith indicated that during the September 25, 2001 interview, the appellant signed a waiver of rights and did not indicate that he needed a lawyer or wanted a lawyer. Agent Smith testified that he explained to the appellant that "it would be up to the district attorney what he wanted to do as far as what type of charges and things" and that he never promised probation in exchange for a confession. On cross-examination, the prosecutor questioned Agent Smith regarding a polygraph test given to the appellant on the date of the interview to show that the appellant began to "tell the truth" during the polygraph test.

At the conclusion of the jury-out hearing, the trial court did not rule on the motion, but rather continued with the testimony of Agent Smith. During Agent Smith's testimony, he was asked if the appellant told him he "wanted to come clean." In response, trial counsel for the appellant objected to the introduction of the statement. The trial court, at that point, stated, "I would overrule."

The appellant's argument on appeal is essentially an argument that he did not voluntarily waive his Miranda rights prior to giving the second statement.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. Questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trial court as the trier of fact. Id. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view

of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 775, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused "shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the United States Supreme Court held that a suspect must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. Id. at 479. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. Id. Accordingly, for a waiver of the right against self-incrimination to be held constitutional, the accused must make an intelligent, knowing, and voluntary waiver of the rights afforded by Miranda. Id. at 444. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994).

Implicit in the trial court's denial of the motion to suppress is the finding that the testimony of the officers, who explained that they did not make any promises in exchange for the appellant's confession, was more credible than the testimony of the appellant. The evidence does not preponderate against the trial court's denial of the motion to suppress.[3] This issue is without merit.

### Venue

The appellant next argues that the State failed to establish venue in Count Two of the indictment, rape of A.N. Specifically, he argues that the record is devoid of any evidence that the incident that occurred on the boat in the river was located in Trousdale County. The State contends that venue in Trousdale County was established by "at least a preponderance of the evidence."

Article I, Section 9 of the Tennessee Constitution and Tennessee Rule of Criminal Procedure 18 provide an accused is entitled to trial in the county in which the offense is committed. Smith v. State, 607 S.W.2d 906, 907 (Tenn. Crim. App. 1980). Venue is a jurisdictional matter and not an element of the crime charged. State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990). The burden is on the prosecution to prove that the offense was committed in the county provided in the indictment. Ellis v. Carlton, 986 S.W.2d 600, 602 (Tenn. Crim. App. 1998) (citing Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964)). Venue may be shown by a preponderance of the evidence which may be either direct or circumstantial. Ricky Harris v. State, No. 03C01-9611-CR-00410,

---

[3]In a related argument, the appellant also claims that the trial court erred in allowing the results of a polygraph test to come into evidence. First, the actual results of the test were not admitted. Rather, a reference was made to the polygraph examination in order to explain the source of the second statement in which the appellant confessed to the crimes as charged. The appellant did not file a pre-trial motion to suppress discussion of the polygraph examination. Further, the appellant failed to object when the polygraph examination was mentioned by Agent Smith. This issue is waived. Tenn. R. App. P. 36(a).

1998 WL 191441, at *12 (Tenn. Crim. App. at Knoxville, Apr. 23, 1998) perm. to appeal denied (Tenn. 1998) (citing Hopper v. State, 326 S.W.2d 448, 451 (Tenn. 1959)).  Slight evidence with respect to venue will be enough to carry the burden of proof if that evidence is uncontradicted.  State v. Smith, 926 S.W.2d 267, 269 (Tenn. Crim. App. 1995).  The question of venue is for the jury to determine and a jury is entitled to draw reasonable inferences from proven facts and as to the issue of venue.  See Tenn. R. Crim. P. 18(a); State v. Johnson, 673 S.W.2d 877 (Tenn. Crim. App. 1984).

An examination of the record reveals that at no time during the trial did the State ask the direct and important question, "Did these events occur in Trousdale County, Tennessee?"  Had this been done, there would be no issue on appeal.  However, Chief Deputy Sheriff Cothron testified that the appellant's home was in Trousdale County, "close to the river."  This evidence was uncontradicted and even bolstered by the testimony of other witnesses.  A.N. stated that the appellant's house was located in Trousdale County close to the river and that the rape took place on the appellant's boat on the river.  The appellant himself testified that he lived in Hartsville, "right on the river" and that the spot where he boarded the children on his boat was on the river bank "three or four hundred yards" from his house.  He further testified that the location where he put the boat in the water was at Second Creek Dock, approximately 3-5 miles from his house.  We find from our examination of the record that there is sufficient evidence for the jury to infer that the offense of rape of A.N. occurred within the boundaries of Trousdale County.  This issue is without merit.

### Election of Offenses

The appellant contends that the State failed to make "an effective election" based on the fact that the trial court did not instruct the jury regarding what an election is and how they were to consider the election "along with uncharged acts."  The State argues, in turn, that the appellant waived the election issue "by raising . . . [it] for the first time on appeal."  Further, the State argues that even if the appellant did not waive the issue, "the State's election was both specific and effective to ensure a unanimous verdict."

Rule 3(e) of the Tennessee Rules of Appellate Procedure provides that for appeals "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."  Tenn. R. App. P.3(e); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial).  There is no dispute herein that the appellant failed to raise the election issue in the motion for new trial.  Whether properly assigned or not, however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure.  State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).  In order to review an issue under the plain error doctrine, five factors must be present: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.  See State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994); see also Tenn. R. Crim. P. 52(b).

The requirement of election and a jury unanimity instruction exists even though the appellant has not requested them.  See Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).  Moreover, failure to follow the procedures is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt.  See State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000); see also State v.Shelton, 851 S.W.2d 134, 138 (Tenn.

-10-

1993).  As the appellant suggests, the record in this case is devoid of instructions from the trial court regarding election.  Failure of this Court to consider the absence of such instructions is necessary to do substantial justice.  Therefore, we are permitted to consider the issue of election under the doctrine of plain error even though the issue was not presented in a motion for new trial.  See State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997) (holding that "plain error is an appropriate consideration for an appellate court whether properly assigned or not"); Burlison, 501 S.W.2d at 804 (stating that the election requirement "should not depend on [a] demand therefor").

The election requirement was first adopted in this state in Jamison v. State, 94 S.W. 675 (Tenn. 1906).  In Jamison, the Tennessee Supreme Court held that proof of all sexual acts allegedly committed by the defendant against the victim could be admitted into evidence, but to avoid the prosecution of uncharged sex crimes, the State was required to elect the specific act upon which it was relying to obtain a guilty verdict.  Id. at 676.  Since that time, the election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are often unable to identify the exact date on which any one act was perpetrated.  See, e.g., State v. Brown, 992 S.W.2d 389 (Tenn. 1999) (finding that the trial court erred in failing to require an election when the defendant was charged with rape of a child in a one count indictment that covered a six-month time frame, but the proof showed that at least ten instances of digital penetration occurred during the six months alleged, five occurring on one day and five others on different days); Walton, 958 S.W.2d at 724 (finding an election should have been required where sexual offenses were charged in a multi-count, open-ended indictment and where the child victim testified she was raped by the defendant or that he performed cunnilingus on her on a daily basis for over a year); Burlison, 501 S.W.2d at 804 (finding an election should have been required where the defendant was charged with having "carnal knowledge" of the victim on "divers days between the summer of 1964 and August, 1969," but the proof did not show any particular date).

In 1994 however, Jamison was overruled to the extent it had established an exception to sex crimes that permitted proof of all sexual acts allegedly committed by the defendant against the victim, whether charged or uncharged.  See State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994) (overruling Jamison ).  In Rickman, the court recognized that indictments often charge general time frames that encompass several months and, in those circumstances, the State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction.  Id.  In fact, "it [is] the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense."  Burlison, 501 S.W.2d at 804.

Our supreme court has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim.  See State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); Brown, 992 S.W.2d at 391; Walton, 958 S.W.2d at 727; Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); Shelton, 851 S.W.2d at 137.  The requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence.  Brown, 992 S.W.2d at 391.

In the case herein, the appellant correctly points out that the trial court did not require the State to make an election. However, at the close of the State's proof, the State of its own volition specifically elected the factual basis that it was relying on to convict the appellant of each charge in the indictment by detailing the events that the State wanted the jury to consider on each count. The prosecutor even prepared a sheet detailing the elections that was admitted as an exhibit and available for the jury during deliberations. The prosecutor commented:

Count one the rape of a child, the state elects to use the incident testified to by the victim wherein she testified the defendant had her to perform oral sex in the garage. The distinguishing characteristic was that it was the only time she testified she actually got semen in her mouth, and testified that she washed it out with Grandpa's Coca Cola. That's the one he's being tried for on that.

On count two the rape of . . . [A.N.], the State elects to submit the penetration that occurred in the defendant's boat. This is what she testified as to the last encounter during the two weeks prior to the defendant actually being reported to the sheriff's department. That's the boat incident.

Count three the aggravated sexual battery of . . . [C.N.] age ten. The State elects to use the testimony regarding the first sexual encounter that occurred in the defendant's garage. She testified to that. The victim testified that her grandfather rubbed back and forth on his penis and for the first time she saw semen and asked the defendant what it was and he told her, as she testified, that's what makes girls pregnant.

Then the last count, the sexual battery upon . . . A.N., the State elects to use the bed incident which occurred in the house, wherein the defendant rubbed his penis on the body of . . . [A.N.], attempted to get her to perform oral sex on him. Her sister . . . was the only person in the house and the incident was interrupted as you will recall her testimony by someone driving up. Grandmother or some of them driving up. So those will be the four instances that you'll be voting on.

The trial court instructed the jury that

if from the proof you find that the Defendant has committed crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. This evidence may only be considered by you for the limited purpose of determining whether it provides: (a) the complete story of the crime; that is, such evidence may be considered by you where the prior crime[s] and the present crime are logically related or connected, or are part of the same transaction, so that proof of the other tends, or is necessary, to prove the one charged, or is necessary for a complete account thereof; (b) a scheme or plan; that is, such evidence may be considered by you if it tends to establish that the Defendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other; and (c) the defendant's intent; that is, such evidence may be considered by you if it tends to establish that the defendant actually intended to commit the crime with which he is presently charged. Such evidence of other crime[s], if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

The trial court also instructed the jury that "the verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous."

Thus, although the prosecution in fact elected the offenses upon which it was relying for convictions, the only jury instructions that could be interpreted to pertain to election of offenses are recounted above. Further, the trial court gave only a blanket jury instruction regarding unanimity, but did not give on enhanced unanimity instruction.

An enhanced unanimity instruction is required in certain circumstances where the State is required to make an election

> . . . in cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts. The assessment of this potential would involve consideration of the allegations made and the statutory offense charged, as well as the actual evidence presented. Such an assessment is needed because not every fact, circumstance or theory of guilt will call for an instruction greater than the general one.

State v. Brown, 823 S.W.2d 596, 583 (Tenn. Crim. App. 1991). It is only when the evidence can be placed in "distinct conceptual groupings," of which each would constitute a crime under the same count, does the concern for unanimity arise. See Brown, 823 S.W.2d at 583-84 (citing United States v. Gipson, 553 F.2d 453, 458 (5th Cir. 1977)). In other words, where the State presents evidence of numerous offenses, each of which would constitute a crime as charged in the indictment, the trial court must augment the general jury unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts. A skeletal jury instruction on unanimity paves the way for a strong possibility of a composite jury verdict in violation of an appellant's constitutional rights. See State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Brown, 823 S.W.2d at 583. However, the failure to elect can be harmless beyond a reasonable doubt in an appropriate case. See Shelton, 851 S.W.2d at 138. That is, the evidence may be of such a quality that no real risk of a patchwork or "grab bag" verdict exists. Id.; but see Tidwell, 922 S.W.2d at 501.

The evidence elicited from the victims herein did not indicate that there were numerous offenses occurring during an unspecified period of time. Rather, each of the victims testified to the specific incidents occurring during the summer that A.N. and C.N. lived with their grandfather, the very facts as elected by the State. While there was minimal testimony from C.N. that the abuse "happened often," "every time he was off the truck," or "all summer," the testimony substantiating each instance of abuse was very specific as to both the location and the acts she was required to perform by the appellant. As to each count of the indictment, the State, through its presentation of proof elected to introduce evidence of a specific incident that corresponded with each count so as to ensure a unanimous jury verdict. Further, on cross-examination of both victims, defense counsel specifically examined each victim regarding each event that the State, in his own words, "elected." We conclude, therefore, that the need to augment the skeletal unanimity instruction was not triggered because the evidence in this case is of such a quality that there was no risk that the jury's verdicts were less than unanimous. Accordingly, the failure to provide the jury with an enhanced unanimity instruction was harmless beyond a reasonable doubt under the circumstances of this case. We are convinced that the appellant received a unanimous verdict in each count as there was no real risk of a patchwork or grab bag verdict.

-13-

## Sufficiency of the Evidence

Finally, the appellant argues that the trial court "erred in overruling the defendant's motion for a directed verdict" and that the evidence at trial does not support the verdict of guilt. In a separate issue, the appellant "renews this argument [the sufficiency of the evidence] due to trial counsel's failure to move the trial court at the conclusion of all the proof for a Judgment of Acquittal." The appellant's primary complaint seems to be that the evidence was insufficient because the trial court denied the appellant the opportunity to question A.N. regarding the exact source of her sexual knowledge pursuant to Tennessee Rule of Evidence 412 and denied the motion to suppress the confession. The State counters that the evidence was sufficient to support the verdict.

We assume, for the purposes of appeal, that trial counsel intended to move for a judgment of acquittal rather than a motion for directed verdict. A motion for a judgment of acquittal is a challenge to the sufficiency of the State's evidence of a defendant's guilt. Tenn. R. Crim. P. 29(a). We find that the evidence was more than sufficient to support the jury verdict. This issue is without merit.

## Sentencing

Although not raised by the appellant on appeal, we note that the judgment forms and the transcript are conflicting as to the manner of service of the sentence. As stated previously, the transcript controls when the record shows a conflict between the judgment form and the transcript. Moore, 814 S.W.2d at 383. The transcript reflects that the trial court ordered the appellant to serve concurrent sentences of fifteen years for rape of a child, ten years for aggravated sexual battery, and ten years for rape. In addition, the trial court ordered the appellant to serve a two-year sentence for sexual battery consecutive to the fifteen year-sentence for a total effective sentence of seventeen years. We remand for the trial court for correction of the judgment forms. See Tenn. Code Ann. § 40-35-209(g).

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court, but remand the case for the trial court amend the judgment forms consistent with this opinion.

_____          _____
                                         JERRY L. SMITH, JUDGE