IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 2, 2004

## STATE OF TENNESSEE v. BRENDA HOLLIMAN

**Appeal from the Criminal Court for Shelby County**
**No. 02-00684, 85   W. Otis Higgs. Jr., Judge**

_____

**No. W2003-01736-CCA-R3-CD  - Filed April 8, 2005**

_____

The appellant, Brenda Holliman, was convicted by a jury of first degree murder and conspiracy to commit the first degree murder of her husband.  As a result, she was sentenced to concurrent terms of life without parole and fifteen years.  After the denial of a motion for new trial, the appellant appealed.  The following issues are presented for our review on appeal: (1) whether the trial court erred by denying the appellant's request for a continuance; (2) whether the trial court erred by failing to excuse a juror for misconduct; (3) whether the trial court erred by failing to instruct the jury on the missing witness rule; and (4) whether the trial court erred in denying the appellant's motion to suppress his statement.  For the following reasons, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. C. MCLIN, JJ., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Brenda Holliman

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; William L. Gibbons, District Attorney General, and Jerry Kitchen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

In 1992, the appellant married Charles Holliman, the victim. The couple lived in Memphis, Tennessee, where the appellant worked at Federal Express. In 1993, the appellant took out a $150,000 life insurance policy on the victim. On July 5, 1994, the victim was found dead at J.P. Werner, his place of employment, from two gunshot wounds to the head.

After the victim's death, the appellant attempted to collect on two life insurance policies for which she was the beneficiary. At that time, the appellant was considered a suspect in the murder of her husband. The insurance companies refused to pay the appellant because of competing claims to the proceeds and the appellant's status as a suspect. A civil suit followed. During the suit, the appellant completed an affidavit in which she denied any involvement with her husband's death. Eventually, the appellant obtained a judgment against the insurance companies and then settled with the other claimants to avoid an appeal. The appellant received a substantial amount of money, but significantly less than the total value of the two policies.

In March of 2000, at the request of the Shelby County District Attorney General's Office, Special Agent John Simmons of the Tennessee Bureau of Investigation became involved in the investigation of the murder of the victim. As part of the investigation, he subpoenaed the bank records of the appellant. After reviewing those records, Special Agent Simmons notified the appellant in writing that her bank records had been subpoenaed. In response to that letter, the appellant contacted Special Agent Simmons and asked for an explanation. Special Agent Simmons explained that the letter was simply notification of the subpoena.

The next day, Special Agent Simmons was contacted by attorney Leslie Ballin, who was calling on behalf of the appellant. Special Agent Simmons explained the purpose of the letter to attorney Ballin. At the end of their conversation, Ballin said, "Well I guess I'm representing her, if she needs representation." Special Agent Simmons told Ballin to contact the prosecutor if he had questions regarding the case. Ballin did not tell Special Agent Simmons to refrain from contacting the appellant.

As a result of Special Agent Simmons's investigation, James Rodney Mills, a cousin of the appellant, and Kermit Keith Faglier were identified as suspects in the murder in 2001. After being confronted, Faglier confessed his involvement in the murder, claiming that the appellant offered to pay he and Mills $50,000 from the insurance proceeds if they murdered her husband. Faglier agreed to cooperate with the investigation of the appellant, calling the appellant several times on the telephone and eventually meeting the appellant at a Memphis hotel. During that meeting, the appellant paid Faglier $6,400 for his participation in the murder.

In January of 2002, Mills, Faglier, and the appellant were indicted by the Shelby County Grand Jury for first degree murder and conspiracy to commit first degree murder. The appellant was arrested on January 29, 2002, at her home in Memphis. After her arrest, Special Agent John Simmons played part of the video tape of the meeting with Faglier for the appellant. At the conclusion of the video, Special Agent Simmons advised the appellant of her constitutional rights. The appellant waived her rights and agreed to make a sworn statement.

In her sworn statement, the appellant admitted that she was married to the victim, was Mills' first cousin, and met Faglier through Mills about one month before the murder. The appellant claimed that the murder plot was Mills's idea. She stated that Mills was motivated by a desire to get a share of the proceeds from a life insurance policy on her husband and that Mills offered him and Faglier to murder her husband for $25,000 each. The appellant admitted that she paid one of the men $900 before the murder and that she knew the murder would happen, but did not know when. The appellant claimed that Mills and Faglier took the murder weapon from her house. On the day of the murder, the appellant was at a party at a relative's home when Mills told her that he "had taken care of business." At that time she knew her husband had been murdered. The appellant admitted that she received approximately $100,000 in insurance proceeds after a lawsuit regarding disbursement of the proceeds from life insurance policies on her late husband was settled. The appellant explained that, after she received the money, she withdrew money in small amounts from her bank account to avoid suspicion. With that money, she paid Mills approximately $20,000. On another occasion, the appellant admitted giving Mills an additional $10,000, which Mills was supposed to give to Faglier.

The appellant filed a motion to suppress the statement on April 23, 2002, arguing that the statement was taken while Agent Simmons knew the appellant to be represented by counsel. The trial court denied the motion after hearing testimony from both Special Agent Simmons and Ballin.

On July 3, 2002, the appellant filed a motion to continue. In support of that motion, the appellant alleged that additional time was needed to develop the facts concerning her relationship with the victim. The appellant also alleged that relevant medical records would not be available in time for the scheduled trial date. After a hearing, the trial court denied the appellant's motion.

On July 15, 2002, the date that trial was scheduled to begin, the appellant filed a motion to reconsider the denial of the motion for a continuance. The appellant offered the testimony of Dr. Little-Hendren, John Billings, an investigator working for the appellant, and the appellant herself to support the motion. At the conclusion of the hearing on the motion, the trial court offered the appellant a continuance until Monday, July 22, to further develop the battered woman's defense. The appellant declined this offer. The trial court then denied the motion to continue.

State's Proof

At trial, Kermit Keith Faglier testified that he was contacted by Tennessee authorities in October or November of 2001 while he was incarcerated in the Washington County Jail in Hillsboro, Oregon. Faglier met with the prosecutor and Special Agent Simmons, gave a statement admitting his involvement in the murder and agreed to cooperate with the authorities.[1]

Faglier testified that he met Mills in May of 1994 in the Shelby County Jail while he was in custody on theft charges. Mills told Faglier that he came to Tennessee to put a new roof on his cousin's house and to take care of some business for the appellant. Mills told Faglier that he had a problem with the way the victim treated the appellant. The appellant told Mills that the victim abused her. Mills informed Faglier that he planned to kill the victim. After he was released from jail, Faglier met with Mills and was introduced to the appellant. Mills informed Faglier that he had talked to the appellant and found out that there was an insurance policy on the victim. Mills claimed that the appellant wanted to have the victim killed and was willing to pay $50,000 to have the job done. Mills offered Faglier half of that money for his assistance in the murder.

Faglier testified that Mills was responsible for setting up the agreement with the appellant. The two men met the appellant for lunch, where the appellant gave Mills a payment of approximately $700-$900 for the murder. The appellant told Mills that the handgun was in the headboard of her bed. Faglier went with Mills to the appellant's house to retrieve the gun. With the money they received from the appellant, Mills and Faglier each got a tattoo and awaited further instruction from the appellant.

Faglier testified that at a cookout at Ronnie Robert's house on July 3, 1994, the appellant told Mills that the victim was at work alone. Between 3:00 and 4:00 p.m., Faglier and Mills left the party, stopped at a bar for a drink and went to J.P. Werner, the victim's place of employment. When they arrived, the victim's car was not there, so the two drove around and waited for the victim to arrive. When they returned, the victim's car was outside. Faglier took the handgun from the glove compartment and handed it to Mills. Mills told Faglier to wait in the truck, which he left running, and to blow the horn if anyone drove up. Shortly after Mills went inside, Faglier heard what sounded like two gunshots. When Mills exited the building, he got into the car and tossed the gun to Faglier. Mills claimed that he "took care of that," that he "killed Charlie" and "shot him." Mills told Faglier that he shot the victim two times.

The two men left and drove around. Mills took the bullets and the speed loader from the gun and tossed them out the window. Mills then told Faglier to toss the gun into a storm drain. While

---

[1] Faglier's attorney later testified that he received no promises regarding the disposition of his case in exchange for his cooperation. Further, Larry McKinney of the Washington County Sheriff's Office in Oregon testified that Faglier received no consideration on his Oregon cases for cooperating with the Tennessee authorities.

driving around, Mills remembered that he "forgot to wipe . . . [his] fingerprints from the door," so the two returned to J.P. Werner so that Mills could wipe the door clean.

When Mills and Faglier returned to the cookout, Faglier claimed that they notified the appellant that they "took care of business." Mills told the appellant that he had killed the victim. Faglier testified that the appellant acted as if it were "o.k." At that point, Mills and the appellant left in the appellant's car. When they returned, Mills was driving a white Lincoln Towncar that the appellant had rented for him.

Faglier claimed that he never collected any of his share of the money. He left Memphis in February of 1995. Sometime thereafter, Faglier was incarcerated in Arkansas. He claimed that during this time, he received a letter from Mills. Faglier stated that he contacted the appellant a few times in late 1995 or early 1996. Faglier claimed that he had no contact with the appellant after that time until he was contacted by Tennessee authorities in 2001.

After being contacted by Tennessee authorities, Faglier agreed to call the appellant to verify his story about the murder of the victim. After the telephone calls, Faglier was transported back to Tennessee where he set up a meeting with the appellant to discuss the murder and the money he was owed. During the meeting, the appellant paid Faglier $6,400.

Special Agent Simmons testified that as a result of his investigation and the information obtained from Faglier, he obtained an arrest warrant for the appellant on charges of first degree murder and conspiracy to commit first degree murder. Special Agent Simmons recounted the circumstances surrounding the appellant's arrest and accompanying statement acknowledging her participation in the murder of the victim.

Dr. O.C. Smith, the Shelby County Medical Examiner, performed the autopsy on the victim. He testified that the victim received two gunshot wounds, one to the right side of his neck and one to the back of his head. The victim also suffered from various abrasions, bruises, lacerations, and skin scrapings on his face. Dr. Smith opined that the victim was shot from a range of between two feet and eighteen inches due to the presence of power burns on the victim. Dr. Smith described the gunshot wound to the neck as a "flesh wound" but described the gunshot wound to the head as fatal, almost instantly rendering the victim unconscious, causing the victim to lose control of his body and bleed extensively. Dr. Smith described the cause of death as multiple gunshot wounds. He noted that the victim had no defensive wounds and that some of the victim's other injuries could have been produced by "pistol whipping." Dr. Smith testified that the level of decomposition of the victim's body at the time it was discovered was consistent with the murder having been committed between 3:00 and 4:00 p.m. on July 3, 1994.

Leon Holliman, the victim's brother, testified that at the time of the murder the victim and the appellant were having marital and financial problems. He testified that the victim had moved out of the house a couple of times, and that the appellant had told the victim he was not going to leave her with all the bills they owed. He stated that the victim contacted him on July 3, 1994, to

ask if he could borrow a trailer to transport his dwarf race car to a race in Little Rock, Arkansas. Mr. Holliman found out about the murder the following Tuesday when another one of his brothers called. Mr. Holliman stated that the appellant was calm throughout the funeral.

Sheila Ritch testified that she met the appellant one time but talked to her on the telephone regularly. At the time, her husband worked with the victim at J.P. Werner. For about a month prior to the murder, the appellant called her house every night "just of kind of making sure that they [Mr. Ritch and the victim] were working together and that they were working." Ms. Ritch claimed that the appellant just started calling her "out of the blue." During their conversations, the appellant mentioned that she suspected the victim was having an affair and that she was checking on him. Ms. Ritch told the appellant that the victim was "talking to" a woman who worked at Construction Tools, but that she did not know if they were romantically involved. During the telephone calls, the appellant informed Ms. Ritch if she caught the victim cheating on her she would have him "taken care of" with a single telephone call. The appellant also told Ms. Ritch that the victim was abusive and that she would have the victim killed.

Ms. Ritch did not meet the appellant until July 2, 1994, when the victim and the appellant came to her house. The appellant showed Ms. Ritch her finger and explained that the victim had slammed it in a door. The appellant claimed that she loved the victim and thought that things would be okay, but that the victim told her he did not love her anymore and wanted to leave her. The appellant then told Ms. Ritch that the victim's time would come and "those that have the last laugh laugh the loudest" and "time will tell."

Ms. Ritch did not hear from the appellant again until after the victim had been murdered. The appellant called her house asking what the victim looked like when his dead body was discovered. Ms. Ritch described the appellant as unemotional during the telephone call. Later, Ms. Ritch and her husband went to the appellant's home. The appellant proceeded to show them drawings that depicted the location of the victim's gunshot wounds and cuts. Ms. Ritch again described the appellant as unemotional.

James Ritch, Sheila Ritch's husband, worked with the victim at J.P. Werner. He claimed that he and the victim started working overtime hours several months before the murder. He testified that the two finished one of those jobs on July 2, 1994 around midnight at his house. The appellant was inside with Ms. Ritch while he and the victim worked outside. Mr. Ritch knew that the victim was having an affair and was not happily married at the time of his murder.

When Mr. Ritch returned to work after the holiday weekend, the parking lot was full of police cars. At that time, he had reason to believe that the victim was dead. He remembered that a few weeks before the murder, the appellant promised to pay him for his work if anything happened to the victim.

Mr. Ritch also remembered that he and his wife went to visit the appellant after the funeral. While there, the appellant showed the two a file she was keeping concerning the murder. The file

contained the autopsy report, including a diagram depicting the wounds on the victim's body. Mr. Ritch described the appellant as "a little shaky," but otherwise fine.

Dana Boyd testified that she met the victim in 1994 while working at Construction Tools. She claimed that she dated the victim for a few months beginning in May of that year. The victim stayed with her "two or three times a week," but she did not know that the victim was married until several weeks prior to the murder. The victim told her that his marriage was over and that he was going to get a divorce.

Ms. Boyd testified that the victim was supposed to take part in a race in Little Rock, Arkansas on July 4, 1994. She had been out of town visiting her mother and returned on July 3. When she returned to town, she drove by J.P. Werner to see the victim before he left for Little Rock. When she drove by around 3:45 or 4:00 p.m., she saw a car in the parking lot but did not stop to see if the victim was there. Ms. Boyd tried to call the victim when she got home that night but nobody answered. Ms. Boyd called J.P. Werner on Tuesday and found out that the victim had been murdered. Two weeks later, the appellant called Ms. Boyd and wanted to meet her. Ms. Boyd declined to meet with the appellant.

Larry Lawrence was the victim's boss and owner of J.P. Werner, a sheet metal company. Mr. Lawrence remembered talking with the victim about his marital problems after they began to affect the victim's work. The victim slept at the office on occasion. Mr. Lawrence testified that he remembered the victim leaving work early one evening to go with the appellant to get a life insurance policy. The victim told Mr. Lawrence that the policy was the appellant's idea. The victim commented to Mr. Lawrence that after they got the insurance policy, the appellant told him that he was worth more to her dead than he was alive. When the victim spent the night at the office or did not go home, the appellant would "ritually call our office the next morning" to find the victim.

When Mr. Lawrence went in to work on the morning of July 5, 1994, the victim's brother's truck was parked by the side door. Mr. Lawrence went inside and began to make coffee when an employee named James Johnson rushed to get him to tell him that the victim was laying on the floor of the shop dead. Mr. Lawrence testified that the appellant did not call the shop that morning looking for the victim, but called him at home later that night to explain why she had not called that morning. During that telephone call, the appellant did not ask about the victim. Sometime later, the appellant called J.P. Werner and asked where in the shop the victim was laying and how much blood there was.

Mr. Lawrence remembered the appellant being calm at the victim's funeral. At the funeral, the appellant wore a scarf decorated with skulls and crossbones and was accompanied by Mills.

Bruce Holbrook of the Memphis Police Department was the crime scene officer called to J.P. Werner to process the scene. He located the victim on the floor of the shop in a pool of blood. Mr. Holbrook noted that a truck was parked outside and there was a race car in the shop. Mr. Holbrook

recovered a bloody ball cap, two cigarette butts, the victim's wallet, three sets of keys, a pair of fingernail clippers, some cash, and some change from the crime scene.

Captain Michael Houston testified that he was assigned to the "old mystery team" of the homicide division of the Memphis Police Department from 1998 through 1999. At the request of Merle Holliman, one of the victim's brothers, Captain Houston became involved in the investigation. On September 13, 1999, Captain Houston was informed that James Albert Mills, the father of Mills, was trying to contact him. As a result of his conversation with Mr. Mills, the investigation into the victim's murder was reopened.

James Robert Angel testified that he was an insurance agent with State Farm Insurance Company and had known the appellant since approximately 1985. Mr. Angel stated that in 1993, the appellant contacted him regarding an insurance policy on the victim. Mr. Angel met with the appellant and the victim at their home on February 20, 1993, and issued a $150,000 insurance policy on the life of the victim. The appellant was listed as the primary beneficiary.

Randall J. Fishman represented the appellant in the civil lawsuit regarding the life insurance policy on the victim. He explained that there was a dispute over payment on the two life insurance policies which both named the appellant as the beneficiary. The lawsuit focused on identifying to whom the proceeds were payable. The insurance companies were not voluntarily going to pay the appellant because of competing claims to the proceeds, and the appellant's status as a suspect in the victim's murder. Mr. Fishman explained that he eventually obtained a judgment on the appellant's behalf, but settled with the other claimants to avoid an appeal. Mr. Fishman testified that the appellant received substantially less than the value of the two policies. Mr. Fishman admitted that during his representation of the appellant, she signed an affidavit in which she swore that she was not involved in the victim's death.

Kathy May was the court reporter who transcribed a deposition of the appellant in the civil suit. During the deposition, the appellant again denied her involvement in the victim's death.

Appellant's Proof

Richard Mills, the brother of Defendant Mills, testified that he spoke with Mills on the evening of the murder and that Mills admitted that he and Faglier murdered the victim. Mills told his brother that he murdered the victim because he thought the victim had turned him in and caused him to go back to jail and because the appellant was going to pay each of them $25,000. Mills told him that "he bet [the victim] wouldn't turn anybody else in."

While he worked for People's Health at Federal Express, James Rice, a counselor, met with the appellant two times in 1994. The appellant sought counseling on September 8, 1994 because of emotional difficulties related to the death of her husband. Mr. Rice diagnosed the appellant as suffering from adjustment disorder with mixed emotional features on the proviso that post-traumatic stress disorder be eliminated as a diagnosis. Mr. Rice testified that the appellant reported verbal and

emotional conflicts with the victim prior to his death, including physical abuse over the preceding two to three months. During a follow-up visit on September 14, 1994, the appellant reported that she had suffered from spousal abuse and marital conflicts and felt as though people were blaming her for her husband's death. At this visit, the appellant complained of weight loss and insomnia.

Dr. Marsha Little-Hendren, a clinical psychologist, testified that she was appointed to examine the appellant. She discovered that in 1994, the appellant was diagnosed with adjustment disorder secondary to life circumstances ruling out post-traumatic stress disorder. According to Dr. Little-Hendren, this diagnosis meant that post-traumatic stress disorder was suspected. Dr. Little-Hendren testified that the appellant had a long history of abuse that began with physical and verbal abuse from her parents and continued to include the rape by an acquaintance when she was twenty-one years old. The abuse continued with the appellant's marriage to the victim. The appellant also claimed to have suffered sexual abuse from her brother and a cousin. Dr. Little-Hendren opined that the appellant was suffering from post-traumatic stress disorder in 1994.

Dr. Samuel T. Summers, Sr., a family practice physician, testified that he treated the appellant for an injury to her little finger on June 9, 1994. The appellant told Dr. Summers that her finger had "gotten slammed in the door." At a follow-up visit, a fracture was discovered and the appellant was referred to an orthopedic surgeon. Dr. Summers also testified that the appellant was treated at Baptist Hospital on May 31, 1994 for an "elbow to the chest."

The appellant took the stand in her own defense. She testified that she married the victim in 1992. In 1994, Mills came to live with her and the victim. The appellant admitted that she discussed murdering the victim with Mills. She told Mills where to find her handgun and then met with Mills and Faglier at a restaurant where she paid them some money. The appellant stated that she went to a cook-out at her cousin's house on July 3, 1994, and that sometime that day Mills told her that the victim had been killed. The appellant also testified that she met with Faglier in a hotel room to pay him for his participation in the killing. However, the appellant claimed that there was no agreement for the killing and that she only participated to the extent that she did because Mills had threatened to kill her and her family. The appellant claimed that she was afraid of Mills. The appellant also testified that she suffered a broken finger, a broken ankle and a bruised sternum during "marital difficulties" with the victim.

At the conclusion of the evidence, the jury found the appellant guilty beyond a reasonable doubt of first degree murder and conspiracy to commit first degree murder.

### Proof During the Penalty Phase

During the penalty phase of the trial, the jury heard testimony from Merle Holliman, a brother of the victim, and Gloria Wheeler, the appellant's older sister. At the conclusion of the penalty phase of the trial, the jury found that the State had proven that the murder was committed by employing another to commit the murder for remuneration, the contract killing aggravating circumstance found

in Tennessee Code Annotated section 39-13-204(i)(4). As a result, the jury imposed a sentence of life without parole.

After the denial of a motion for new trial, the appellant appealed, presenting the following issues for our review: (1) whether the trial court erred by denying the appellant's request for a continuance; (2) whether the trial court erred by failing to excuse a juror for misconduct; (3) whether the trial court erred by failing to instruct the jury on the missing witness rule; and (4) whether the trial court erred in denying the appellant's motion to suppress her statement.

## Denial of Continuance

Initially, the appellant contends that the trial court erred in denying a continuance. Specifically, the appellant argues that the denial of the motion to continue prohibited the development and additional investigation of the battered woman's syndrome defense and thus constituted a denial of her right to due process. The State counters that the trial court did not abuse its discretion in denying the motion for continuance.

The granting of a continuance rests within the sound discretion of the trial court. State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004). We will reverse the denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995). In order to show prejudice, the defendant must demonstrate that a different result might reasonably have been reached if the trial court had granted the continuance or that the denial of the continuance denied the defendant a fair trial. Id. Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. Odom, 137 S.W.3d at 589.

In the case herein, the trial court appointed Dr. Marsha Little-Hendren, a clinical psychologist, on April 30, 2002, to evaluate the appellant and assist in her defense. Dr. Little-Hendren reviewed the appellant's medical records, met with her several times, and diagnosed the appellant as suffering from post-traumatic stress disorder. Dr. Little-Hendren did not diagnose the appellant with battered woman's syndrome. On July 3, 2002, less than two weeks prior to the date trial was scheduled to begin, the appellant filed the motion to continue. In the motion, the appellant requested the appointment of a second expert, Dr. Keith Caruso, a psychiatrist and expert in battered woman's syndrome and sought the continuance to allow time for Dr. Caruso to perform a mental evaluation on the appellant. Further, the appellant alleged that relevant medical records would not be available in time for the scheduled trial date.

The trial court denied the appellant's motion after a hearing, but approved further funds for the appointment of Dr. Caruso. The trial court agreed to allow the appellant until the date that trial was scheduled to begin, July 15, but that he "just . . . [did not] see how we need to delay the trial." Ultimately, the administrative office of the courts refused funds for the appointment of Dr. Caruso because the trial court had already appointed Dr. Little-Hendren.

On July 15, 2002, the date that trial was scheduled to begin, the appellant filed a motion to reconsider the denial of the motion for a continuance. The appellant offered the testimony of Dr. Little-Hendren, John Billings, an investigator working for the appellant, and the appellant herself to support the motion. At the conclusion of the hearing on the motion, the trial court offered the appellant a continuance until Monday, July 22, to develop further the battered woman's defense. The appellant declined the continuance. The trial court then denied the motion to continue, determining that the appellant "hasn't given us anything that's indicative of a person suffering from a mental disease or defect that would not allow her to form a culpable mental state to constitute murder in the first degree."

After the conclusion of the trial, appellant's counsel entered into the record as a stipulation a letter from Dr. Caruso in which he determined that there was "no evidence to support a 'Battered Woman's Syndrome' defense." In that same letter, Dr. Caruso stated that his "testimony . . . would not serve . . . [the appellant's] interests and likely would work directly against them."

We fail to see how the trial court abused its discretion in denying the continuance under these circumstances. The trial court offered the appellant one additional week to further develop the defense which the appellant refused. Further, the appellant has failed to show actual prejudice as a result of the denial of the continuance. The letter from Dr. Caruso certainly does not bolster the appellant's position. The appellant has failed to satisfy her burden. This issue is without merit.

### Denial of Motion to Suppress

The appellant next challenges the trial court's decision to deny the motion to suppress her statement. Specifically, the appellant contends that the statement should have been suppressed because she was not taken before a magistrate without unnecessary delay. In support of that contention, the appellant claims that the police delayed her appearance before a magistrate in order to induce her confession. The State argues that the appellant waived the issue because she argued an inconsistent position in the trial court and has now changed her theory on appeal.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. Questions of witness credibility, the weight and value of evidence, and resolution of conflicts in the evidence are entrusted to the trial court as the trier of fact. Id. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. See State v. Walton, 41 S.W.3d 775, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999). "The application of the law to the facts found by the trial court, however, is a question of law which this Court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In the case herein, the appellant filed a motion to suppress the statement on April 23, 2002, alleging that Leslie Ballin "had given notice to all law enforcement officials that he represented the defendant and that he wished to be present for any and all interrogations of the defendant." The trial court denied the motion after hearing testimony from both Special Agent Simmons and attorney Ballin. The trial court determined that Ballin contacted Simmons and made an ambiguous statement about possibly being the appellant's attorney, but did not instruct Simmons to refrain from talking to the appellant. Further, the trial court determined that Simmons was not required to notify Ballin before sending the letter to the appellant to notify her that her bank records had been subpoenaed. Additionally, the trial court determined that Simmons was not obligated to notify Ballin of conversations between the appellant and Faglier or the meeting between Faglier and the appellant. The trial court also determined that Simmons was not required to notify Ballin before he took the appellant's statement. The trial court concluded that the appellant was properly advised of her constitutional rights and given an opportunity to request the assistance of her attorney, but chose to waive those rights and make a sworn statement. The trial court concluded that the appellant's statement was thus freely and voluntarily given.

On appeal, the appellant argues that "it is obvious that upon the defendant's arrest as a result of a warrant, the officer did not take the defendant immediately before a Magistrate because he used such detention and delay as a tool to induce a confession." Thus, the appellant argues that the trial court erred in denying the motion to suppress.

It is well-settled that a defendant may not take one position regarding an issue in the trial court, then change her strategy or theory and advocate a different position on appeal. State v. Leach, 148 S.W.3d 42, 55 (Tenn. 2003); Johnson v. State, 38 S.W.3d 52, 60 n.8 (Tenn. 2001). On appeal, the appellant has abandoned the argument used at the hearing on the motion to suppress that the statement was procured without seeking permission from counsel. In the motion for a new trial, the appellant argued that the statement should have been excluded because she was "denied counsel, improperly detained, and questioned for hours after being taken into custody and requesting counsel." The theory argued to this Court that the appellant was not taken in front of a magistrate without unnecessary delay was not presented to the trial court. This issue is therefore waived.

### Failure to Remove Carl Jackson as Juror

Next, the appellant challenges the trial court's ruling regarding the removal of one of the jurors. Specifically, she contends that even though the trial court removed alternate juror Nancy Cary because she knew one of the state's witnesses and communicated that fact to a fellow juror, the trial court should have also removed juror Carl Jackson because Juror Cary told him that she knew the witness. She argues that prejudice toward her defense is presumed and the trial court erred in failing to remove Juror Jackson. The State counters that the trial court correctly concluded that Juror Jackson was not disqualified.

Consistent with constitutional guarantees, this Court has previously observed that "[b]oth the defendant and the State are entitled to a fair trial by unbiased jurors and it is the duty of the trial

judge to discharge any juror who for any reason cannot or will not do his duty in this regard." Walden v. State, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976). Tennessee Rule of Criminal Procedure 24(e)(1) clearly contemplates the replacement of a juror with an alternate if, at any time prior to the jury's withdrawal to consider its verdict, the trial court finds the juror "to be unable or disqualified to perform [his] duties." State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quoting Tenn. R.Crim. P. 24(e)(2)); see also State v. Max, 714 S.W.2d 289, 293 (Tenn. Crim. App. 1986) (citing Tenn. R. Crim. P. 24(e)(1)). The determination of whether a juror is unable or disqualified to perform his duties lies within the sound discretion of the trial court. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). The defendant bears the burden of demonstrating that the trial court abused its discretion and that he was prejudiced by the substitution. Max, 714 S.W.2d at 294.

The principal rationale for granting a trial court discretion in determining a juror's "acceptability" lies in the court's ability to "observe the demeanor and credibility of the juror." Forbes, 918 S.W.2d at 451; see also State v. Smith, 993 S.W.2d 6, 29 (Tenn. 1999); State v. Harris, 839 S.W.2d 54, 64 (Tenn. 1992). Indeed, our supreme court has held that a trial court's finding of a juror's impartiality may be overturned only for "'manifest error.'" State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993) (citing Patton v. Yount, 467 U.S. 1025, 1031 (1984)). In other words, the burden rests on the appellant to establish by clear and convincing evidence that the court's finding of impartiality was erroneous. Smith, 993 S.W.2d at 29; Harris, 839 S.W.2d at 64.

If it can be shown that one or more jurors were subjected to extraneous information or improper outside influence, a rebuttable presumption of prejudice arises, the burden of proof shifts, and the State must substantiate the conduct or establish its harmless nature. State v. Parchman, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997). Extraneous information that would warrant a new trial if found to be prejudicial includes: (1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence; and (3) communications with non-jurors about the case. Carruthers v. State, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003) (citing Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990)).

In the case herein, during a jury-out hearing that took place after the testimony of State's witness Faglier, it was brought to the attention of the trial court that "one of the [alternate] jurors [Nancy Cary] . . . knew the last witness." The parties agreed to dismiss the juror, but the trial court decided to question the juror on the record regarding her relationship with the witness prior to her dismissal. Juror Cary admitted after being questioned that she knew witness Faglier and communicated that fact to the juror sitting next to her. The following exchange appears in the record:

> THE COURT: Have you communicated that [the fact that you know the witness] to any of the other jurors?
> JUROR NANCY CARY: I don't think so. Well, the guy sitting next to me told me he saw him staring at him [sic].
> THE COURT: Say what now?

JUROR NANCY CARY: The guy sitting next to me said he saw him staring at me. And I said, well, you know, he was at our prison.
THE COURT: He was what?
JUROR NANCY CARY: At our prison.
THE COURT: He was at your prison?
JUROR NANCY CARY: At the prison I worked at.
THE COURT: So you worked at a prison?
JUROR NANCY CARY: Right.
THE COURT: And you saw this man at the prison?
JUROR NANCY CARY: Uh-huh. Yes.
THE COURT: When you say you knew him, is that what you mean?
JUROR NANCY CARY: Well, I know him from coming to my department for medical problems and things like that.
THE COURT: All right. And now I'm concerned about the communication with the other jurors. The juror seated next to you right there - -
JUROR NANCY CARY: Uh-huh.
THE COURT: - - and said to you that Mr. Faglier was staring at you?
JUROR NANCY CARY: Uh-huh. He said he kept looking at me.
THE COURT: Kept looking at you?
JUROR NANCY CARY: Uh-huh.
THE COURT: And then you said what to the juror?
JUROR NANCY CARY: I said, well, he's at our prison. He may have recognized me from there.

At the conclusion of the inquiry the trial court dismissed Juror Cary. The trial court then questioned Juror Carl Jackson. The following colloquy occurred:

THE COURT: All right. Mr. Jackson, I need to ask you a couple of questions. I've been advised that you said to the lady seated next to you, the juror seated next to you, that the past witness, Mr. Faglier, appeared to be staring at you or looking at you.
JUROR CARL JACKSON: Yeah, I mentioned that.
THE COURT: You said that to the lady?
JUROR CARL JACKSON: Yes, sir.
THE COURT: And do you recall what she said to you?
JUROR CARL JACKSON: No - - something about where she worked at or something like that, sir.
THE COURT: The best you can remember. I just want you to try as best you can to remember exactly what the exact words were, what she said to you.
JUROR CARL JACKSON: He's at the place I work, or something like that. I don't - - I really, like I said, really can't remember. I think it was, he's at the place that I work at. He's at my job, or something like that.

-14-

Juror Jackson denied speaking with any other juror about the incident and the trial court admonished him not to speak about either the incident or his meeting with the trial court to the other jurors. The trial court then determined that Juror Jackson would not be dismissed, stating:

> Well, the truth of the matter is that this lady freely admitted that she worked at a penal institution. This man is incarcerated. He had been incarcerated in Shelby County. It's reasonable to assume that she might have known him from there. But I had no way of knowing where she knew the man from. But if she said to a juror that I know him from the institution or where I work, she shouldn't have said that. That was improper. She shouldn't have made that statement. I admonished her, don't discuss the case. The question is, is the statement from the juror, . . . he's staring at you or he's looking at you. . . . Is that improper for one juror to say to another juror? He's really staring at you? I mean, I don't think what he's done or what he's said has risen to the point of some impropriety. But what bothers me is what she said to him. She said to him, I know him from my job. I know him from work. Well, he admits he's an ex-convict and he's serving time. I mean, I don't know what prejudice that's going to bring on the process. Or he's presently serving time and has served time in Shelby County and a lot of other places. . . . Well, I'm going to keep him.

We cannot determine that the trial court abused its discretion in refusing to dismiss Juror Jackson. After being questioned, the trial court determined that Juror Jackson was not disqualified from performing his duty as a juror. The appellant has failed to show prejudice as a result of the trial court's actions. The witness acknowledged on the stand that he had been in and out of prison, even discussing at length his incarceration in Shelby County where he first met Mills. Moreover, Faglier was a witness against the appellant. His status as a perpetual criminal could only have helped the appellant in discrediting his testimony. Juror Jackson was not exposed to any extraneous information which would warrant his dismissal from service. This issue is without merit.

### Missing Witness Instruction

Finally, the appellant challenges the trial court's failure to instruct the jury on the missing witness rule. Specifically, the appellant argues that the trial court should have instructed the jury on the missing witness rule because Mills, the "most crucial witness in this case, who had the peculiar knowledge of all the conversations with the defendant, became a witness against the defendant without being subject to cross-examination." The State argues that the "trial court did not err in failing to give an instruction that was not requested and was not required under the facts and circumstances of the case."

We note at the outset that the record does not contain a written request by the appellant for a jury instruction on the missing witness. Failure to submit a written special request constitutes a waiver of the issue. See State v. Vickers, 985 S.W.2d 1, 8 (Tenn. Crim. App. 1997); State v. Brewer, 932 S.W.2d 1, 15 (Tenn. Crim. App. 1996). Accordingly, this issue is waived.

Moreover, this issue has no merit. The law regarding the appropriate circumstances for giving the "missing witness" instruction was explained by our supreme court in State v. Francis, 669 S.W.2d 85 (Tenn. 1984). A party may comment about an absent witness and have the trial court instruct the jury on the failure of an adverse party to call an absent witness when the evidence shows that "(1) the witness had knowledge of material facts, (2) that a relationship exists between the witness and the party that would naturally incline the witness to favor the party, and (3) that the missing witness was available to the process of the Court for trial." Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979). The mere fact that a party fails to produce a particular person who may have some knowledge of the facts involved does not justify application of the inference against him. However, when it can be said "with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony," an inference may be drawn by the jury that the testimony would have been unfavorable. Burgess v. United States, 440 F.2d 226, 237 (D.C. Cir. 1970). The inference may not be invoked when it is shown that (1) the witness "may have some knowledge of the facts involved," Francis, 669 S.W.2d at 88, or (2) the witness is equally available to both parties. State v. Boyd, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992); State v. Eldridge, 749 S.W.2d 756, 758 (Tenn. Crim. App. 1988); State v. Overton, 644 S.W.2d 416, 417-18 (Tenn. Crim. App. 1982).

The record herein establishes that there were no comments made by either party during the trial about the failure of Mills to testify. The appellant also failed to request a special instruction from the trial court. Further, the appellant has not satisfied the strict requirements of Delk. While the missing witness, Mills, did have knowledge of material facts, he pled guilty for his part in the murder. Thus, the prosecution had no reason to be apprehensive about his testimony. More importantly, there is nothing in the record that would suggest that Mills was not equally available as a witness to both parties or was not subject to the process of the court. This issue is without merit.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE

-16-